[Civ. No. 6183.   Fourth Dist.   July 28, 1960.]

PABLO R. ASISTEN, Respondent, v. JERI UNDERWOOD
et al., Defendants; I. JACOBSON et al., Appellants.

W. E. Starke for Appellants.

Edmund Herman for Respondent.

GRIFFIN, P. J.—This is an action (1) to quiet title to the real property covered by two deeds; (2) to cancel the deeds; and (3) for compensatory and exemplary damages. Findings of fact and conclusions of law were made in favor of the plaintiff upon which a judgment was entered quieting plaintiff's title against the defendants. Defendants Jacobson and Chiodo appeal from the judgment.

Plaintiff was approximately 53 years of age and employed as a cook at the time the events involved in this case occurred. He was born in the Philippines, had never attended school and spoke poor English. In February 1958 he owned the property involved in this action, upon which was located a duplex dwelling, one unit of which was occupied by the plaintiff and the other being rented by him to a tenant. It was stipulated by the parties that the value of this property was $14,000.

In February 1958 plaintiff was introduced to Jeri Underwood, who was approximately 22 years of age and without funds. Norman Williams' wife went with her. Jeri's acquaintance with plaintiff arose from plaintiff's statement to his friend that he would like to know some girl because of his lonesomeness. Her true name was Geraldine Murphy and she had previously been married, had obtained an interlocutory decree of divorce, but the final decree of divorce had never been obtained. At the time she met plaintiff, Jeri was living in the home of Norman Williams (whose true name was Norman Williams Ashook). Shortly after they met, Jeri told the plaintiff that she and Williams were planning to open a dance hall and she asked him to advance funds to enable them to obtain a lease. Plaintiff gave Jeri $200 for this purpose and a short time later gave Norman Williams an additional $300 with which to finance preparations for the opening of the dance hall. However, Jeri Underwood's application for a license to operate a dance hall was denied and she and Williams then decided to operate a surplus store instead. Jeri approached the plaintiff and asked him if she could borrow $3,000 to stock the store. Since he had already given her and Williams all the cash he had available, Jeri suggested to plaintiff that the money could be borrowed by using his house as security for the loan and that the loan would be repaid out of the profits of the store. Plaintiff assented to this plan. Jeri moved into plaintiff's apartment with him. On March 13, Jeri and Williams called on plaintiff at his

place of employment and told him the papers were ready to be signed. They had already located a notary public in a nearby office and asked her to be on hand, knowing that plaintiff could be absent from his work for only a few minutes. Plaintiff went with them to the office of the notary public and signed the paper. He testified that he hadn't read the paper before he signed it because another paper was clipped across the top of it and that he didn't know what the paper was when he signed it, but he thought the paper was part of a loan transaction. Plaintiff testified that he would not have signed the document had he known that it was in fact a quitclaim deed transferring his property to Jeri. In her testimony she admitted that the proposal made by her to plaintiff was that his property be used as security for a loan to raise funds to be used to start the business. She admitted that she knew that the deed transferred title of the plaintiff's house to her and testified that she had told plaintiff that it would give her authority to get a loan for him and to save him from missing work while endeavoring to obtain a loan. After plaintiff signed the quitclaim deed, he was given Jeri's promissory note in the face amount of $5,000, payable one year from date. After the quitclaim deed was returned to Jeri from the recorder's office, she gave it to Norman Williams.

Testimony concerning subsequent events is conflicting, but it seems well established that a few days later Jeri and Norman Williams offered to sell the property to defendant and appellant Joe Chiodo for $6,000. Chiodo had been previously acquainted with Norman Williams and other members of his family and had previously loaned them money (evidenced by promissory notes). Chiodo went to look at the property and examined it from the outside. He testified that he did not inspect the premises on the inside, although the offer made to him by Jeri and Williams included the furniture within the house. Apparently Jeri gave Chiodo a bill of sale for all of the furniture in plaintiff's property, which bill of sale was placed in escrow. Nor did Chiodo inquire directly of the plaintiff as to his interest in the property, although plaintiff continuously resided in the premises after the date of the purported quitclaim deed from plaintiff to Jeri. Chiodo agreed to buy the property on the terms offered and on March 17, 1958, an escrow was opened to complete the sale. As an offset against the purchase price, Chiodo cancelled certain promissory notes of Norman Williams and members of his family

and paid the balance of the purchase price with two checks which were cashed by Jeri who then turned the funds over to Williams.

At Chiodo's request, the title to the property was transferred to I. Jacobson and Rose Jacobson, who acted as Chiodo's nominees, taking title to the property as his agents. The Jacobsons then gave Chiodo a deed to the property, listing him as grantee, which deed was never recorded. The Jacobsons testified that they were close friends and business associates of Chiodo and that they took title to the property as his agents at his request. Chiodo testified that he had the title placed in the Jacobsons' name because he planned to travel to Omaha during September 1958 to visit his brother and he wanted the title in the name of someone who could take care of the property for him in his absence. Chiodo's plans for his trip to Omaha never materialized. Contemporaneously with his purchase of the property from Jeri Underwood, Chiodo gave her an option to repurchase, within six months, at a price of $8,200. Shortly afterward, Jeri assigned this option to Norman Williams.

After the sale of plaintiff's property to Chiodo, Williams and Jeri Underwood opened a surplus store in National City and operated it for approximately one month. On April 8, 1958, plaintiff and Jeri went through a marriage ceremony in Tijuana, Mexico. She had not obtained a final decree of divorce at that time. Immediately after the ceremony, Jeri complained of feeling ill and at her request plaintiff took her to the bus depot where she embarked for Los Angeles to visit her mother, where she remained. About April 30, 1958, Norman Williams and a prospective buyer for the surplus store visited Jeri in Los Angeles, at which time the store was sold to the prospective buyer for $5,000. Jeri testified that she endorsed the check over to Williams. Plaintiff did not receive the proceeds of the sale to Chiodo or the proceeds of the sale of the business.

The appellants contend that the trial court's finding that Norman Williams and Jeri Underwood entered into a fraudulent scheme to deprive plaintiff of his real property, and, by means of fraudulent representation, obtained plaintiff's signature on a quitclaim deed transferring title to Jeri, is unsupported by the evidence. Appellants point to testimony in the record tending to prove that the transfer of the property from plaintiff to Jeri was a gift in contemplation of marriage.

Appellants also contend that plaintiff received Jeri's promissory note for $5,000 and contend that this was sufficient consideration and security for plaintiff's transfer of his property. Citing *Marshall* v. *Marshall,* 140 Cal.App.2d 475, 478 [295 P.2d 131] and *Estate of Baxter,* 96 Cal.App.2d 493 [215 P.2d 805].

An examination of the record reveals that the evidence on the issue of fraud was in substantial conflict and presented an issue of fact for the trial court to determine. It found that plaintiff's quitclaim deed to Jeri Underwood was obtained by fraud and concluded that the plaintiff was entitled to have this deed cancelled. The evidence fully supports this finding. It is a settled rule that when a finding of fact is attacked as being unsupported by the evidence, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will uphold the disputed finding. (*Berniker* v. *Berniker,* 30 Cal.2d 439, 444 [182 P.2d 557].)

Appellants further contend that even if the deed from plaintiff to Jeri is voidable, the appellants are bona fide purchasers for value from the holder of record title, and acquired good title thereby, having taken without notice of the fraud practiced upon plaintiff by Jeri and Williams. Citing *Torrez* v. *Gough,* 137 Cal.App.2d 62 [289 P.2d 840] ; *Austin* v. *Pulschen,* 112 Cal. 528, 532 [44 P. 788] ; and *Kowalsky* v. *Kimberlin,* 173 Cal. 506 [160 P. 673]. However, appellants' argument overlooks the fact that plaintiff was in actual possession of the property after the date of his quitclaim deed to Underwood. It is a general rule that possession of real property is constructive notice to any intending purchaser or encumbrancer of the property of all the rights and claims of the person in possession which would be disclosed by inquiry. (*Pell* v. *McElroy,* 36 Cal. 268, 272.) This rule is extended to the case of a grantor remaining in possession after execution and delivery of a deed to his vendee and a subsequent purchaser of the same property must inquire into the equitable rights of the original vendor. (*Pell* v. *McElroy, supra; J. R. Garrett Co.* v. *States,* 3 Cal.2d 379 [44 P.2d 538].) The same rule was applied in *Taber* v. *Beske,* 182 Cal. 214, 217 [187 P. 746], where the court said:

"Appellant contends that there is no evidence to support the finding that Taber, at the time he purchased and received

the deed, was informed of the power of attorney and the circumstances of its execution. The finding that Mary Beske was in actual, open, exclusive, and adverse possession of the lot, by herself and her tenants, at the time Taber bought and paid for the lot, put him on inquiry as to her rights and claims upon the property and charged him with knowledge of all that such inquiry, if pursued, might have developed. (Citations.) His actual knowledge is, therefore, not necessary to support the judgment.''

In the instant case there was evidence of other facts which might have put a reasonable person on inquiry. There is evidence that the parties to the sale from Underwood to Chiodo wanted to complete the transaction with unusual haste. The escrow used to complete the sale was opened on March 17, 1958, and the deed from Underwood to Chiodo was recorded three days later, on March 20, 1958. The escrow file, which was admitted in evidence, contains the following notation, ''SUPER DUPER RUSH RUSH RUSH—NEED MEMO TOMORROW—they wanted to record last week. Thank you.'' Additionally, Underwood testified that at the time she and Williams first discussed the prospective sale with Chiodo, Chiodo asked her if the plaintiff knew she was getting the money on the house and that she said that he did. Furthermore, the evidence discloses that Chiodo paid approximately $6,000 for the property which had a value of $14,000.

In *Rabbit* v. *Atkinson,* 44 Cal.App.2d 752, 757 [113 P.2d 14], it was held:

''If the sum which the vendor is willing to take is grossly disproportionate to the value of the thing which is the subject of the negotiation, it is strong proof of a defective title and sufficient to put a prudent person upon inquiry, and if the purchaser neglects to prosecute such inquiry diligently he may not be awarded the standing of a *bona fide* purchaser.''

While here the difference between the sum actually paid for the property and its reasonable value might not be so disproportionate as to place the purchaser on notice as a matter of law, it is additional evidence which, together with the fact of plaintiff's possession of the property, and the other evidence, is sufficient to support the finding of the trial court that Chiodo had knowledge of sufficient facts to compel inquiry on his part as to plaintiff's rights in the property, and, having failed to make inquiry, Chiodo is not an innocent purchaser of said property and is presumed to have pur-

chased with full notice of and in subordination to the legal and equitable rights of plaintiff.

It further appears that Chiodo personally knew Norman Williams and members of his family for some time, and Chiodo's knowledge of the desire for a loan or sale of the property by Jeri came through the Williams family. Chiodo had loaned money to Norman Williams, his mother and brother Fred, evidenced by promissory notes executed by them and which remained unpaid until this transaction was consummated. Chiodo cancelled these notes as part of the down payment on this property, evidenced by the statement in the escrow that this amount had been paid to seller "out of escrow."

This, in itself, casts considerable suspicion on the claim that Chiodo was an innocent purchaser and in good faith.

■ When a party is aware of facts that would make a reasonably prudent person suspicious, he is deemed to be compelled to inquire further. (50 Cal.Jur.2d 443, § 345.)

■ Usually the question of whether one is an innocent purchaser for value without notice is for the trier of facts to decide. (*Patterson* v. *Blackburn*, 47 Cal.App. 362 [190 P. 483].) ■ When a person obtains title fraudulently and uses it to obtain money from another who is charged with knowledge of the fraud, a return of the money so obtained is not a prerequisite to vacating the transaction and quieting title. (50 Cal.Jur.2d 480, § 377.)

We conclude the total evidence was sufficient to support the findings.

Judgment affirmed.

Shepard, J., and Shea, J., pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.