[No. AO14246. First Dist., Div. One. Aug. 24, 1983.]

CLAREMONT TERRACE HOMEOWNERS' ASSOCIATION,
Plaintiff and Respondent, v.
UNITED STATES OF AMERICA, Defendant and Appellant.

400

**COUNSEL**

Glenn L. Archer, Jr., Assistant Attorney General, John F. Murray, Acting Assistant Attorney General, Michael L. Paup, Robert T. Duffy, John A. Dudeck, Jr., Joseph P. Russoniello and Rodney H. Hamblin, United States Attorneys, Jeffrey Scott Niesen and Michael D. Howard, Assistant United States Attorneys, for Defendant and Appellant.

Gross & Gross and Benton F. Gross for Plaintiff and Respondent.

OPINION

NEWSOM, Acting P. J.—Appeal has been taken by the United States of America from a judgment quieting title to a condominium unit in favor of respondent. The relevant facts of the case are undisputed, and we summarize them only as necessary to resolution of the legal issues presented on appeal.

The Claremont Terrace Condominiums, a large complex of condominium units located in Oakland, California, were built in 1973 and 1974 by Broadway Investors, a limited partnership in which James Dickson and his wife Myra Dickson were general partners. Respondent Claremont Terrace Homeowners' Association (hereafter referred to as Association or respondent), an unincorporated association of dues paying members, was formed soon after the construction of Claremont Terrace Condominiums complex.

On or about March 29, 1974, James and Myra Dickson obtained a loan in the amount of $18,400 from Golden West Savings and Loan Association, secured by a deed of trust in favor of the lender on Unit No. 203 in the Claremont Terrace Condominiums complex. (Unit No. 203 is the property which is the subject of this dispute; it will hereinafter be referred to as Unit No. 203 or the property.) The Dicksons never lived on the property, and in fact on July 29, 1974, the Association decided to purchase Unit No. 203 from the Dicksons for occupation by a resident manager. Thereafter, the Association, through its member Roy Peters, negotiated with James Dickson's uncle, Mort Dickson, to purchase the property.

On December 1, 1974, the Association and the Dicksons executed a "Resident Leave and Option to Purchase" (hereinafter the option agreement), whereby the Association leased Unit No. 203 for $188.23 per month and was given an exclusive option to purchase the property (for 48 months) at a price of $19,026.58. The Association paid $100 in consideration for the option agreement, which was apparently misplaced by Mort Dickson and not recorded until December 22, 1975.

After execution of the option agreement, respondent acted as the owner of the property. Instead of rent, the Association made monthly payments in the amount of the first deed of trust, $142, payable to Broadway Investors, and then later directly to the bank. By and after December 1974, a resident manager occupied Unit No. 203. From March of 1975, respondent made all tax payments on the property.

On May 5, 1975, the Internal Revenue Service assessed a 100 percent penalty against James Dickson in the amount of $109,046.54 for unpaid

federal employment taxes. (26 U.S.C. § 6672.) Appellant filed a tax lien against Dickson with the Alameda County Recorder's office in the amount of the assessed penalty on July 11, 1975.

On December 15, 1975, the Association orally exercised its option to purchase the property, and paid James Dickson $750 for the privilege.[1] When the option was exercised, the Association did not have actual knowledge of the tax lien filed against James Dickson by appellant, but it knew that Dickson was having financial problems. And the Association did not request a title report on the property before it exercised the option.

James Dickson testified that he could not recall signing or delivering to respondent a deed to the property, although his customary business practice was to do so after receiving payment. A deed conveying the property from the Dicksons to respondent was never recorded, nor has one been found. But after receiving payment in December of 1975, the Dicksons acted as if the Association owned the property.

On June 10, 1976, the Dicksons filed for bankruptcy in the federal district court in Oakland, listing liabilities in excess of $4 million and virtually no assets.

The Association first became aware of appellant's tax lien in September of 1977, when a title search was made. The value of the property at the time of trial was approximately $47,500; thus the Association will lose the taxes and mortgage payments made to date, as well as any equity in the property, in the event appellant's tax lien is deemed a senior interest in the property.

Appellant claims that the trial court erred by giving respondent's interest in the property priority over the federal tax lien contending that the lien was assessed and recorded before respondent exercised its option to purchase the property on December 15, 1975, and that such priority is dispositive of the controversy.

Section 6321 of the Internal Revenue Code (26 U.S.C. § 6321)[2] grants the United States a lien upon "all property and rights to property" of a

---

[1]Oral acceptance of the option to purchase did not comply with the terms of the agreement, which required exercise of the option in writing. But neither party objected to respondent's manner of exercising the option to purchase, and the Dicksons do not claim an interest in the property.

[2]Section 6321 provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

taxpayer who neglects or refuses to pay taxes. (*Crocker National Bank* v. *Trical Manufacturing Co.* (9th Cir. 1975) 523 F.2d 1037, 1038.) ■ A tax lien is effective from the date of its assessment (26 U.S.C. § 6322;[3] *United States* v. *Jenison* (D.R.I. 1980) 484 F.Supp. 747, 754), and the federal tax lien at issue here "came into existence at the time demand was made upon the taxpayer," on May 5, 1975. (*United States* v. *Ed Lusk Construction Company, Inc.* (10th Cir. 1974) 504 F.2d 328, 331.)

Since the lien granted by section 6321 arises without notice, in order to protect third party claimants, section 6323 was enacted. (*United States* v. *Truss Tite, Inc.* (S.D.Tex. 1968) 285 F.Supp. 88, 90.) That section requires the government to *record* the lien before it becomes valid against purchasers, holders of security interests, mechanics lienors, or judgment lien creditors. (*Id.*, at pp. 90-91.)[4] Section 6323(a), states: "The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate."

■ The priority of a federal tax lien granted by section 6321 is governed by the common law rule of "first in time is the first in right." (*United States* v. *Equitable Life* (1966) 384 U.S. 323, 326 [16 L.Ed.2d 593, 595-596, 86 S.Ct. 1561]; *U.S.* v. *Pioneer American Ins. Co., supra,* 374 U.S. 84, 87 [10 L.Ed.2d 770, 773-774, 83 S.Ct. 1651].) ■ But a tax lien only attaches to the property of the taxpayer. (*Slodov* v. *United States* (1978) 436 U.S. 238, 257 [56 L.Ed.2d 251, 267-268, 98 S.Ct. 1778]; *Crocker National Bank* v. *Trical Manufacturing Co., supra,* 523 F.2d 1037, 1038.) The Internal Revenue Service has no authority to levy on property in which the taxpayer has no interest. (*Slodov, supra,* 436 U.S. at p. 257 [56 L.Ed.2d at pp. 267-268].)

■ Here, appellant duly recorded its tax lien on July 11, 1975, *after* the Association entered into its option contract with taxpayer Dickson but *before* the option was exercised on December 15, 1975. Since the Associ-

---

[3]According to section 6322: "Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time."

[4]In *U.S.* v. *Pioneer American Ins. Co.* (1963) 374 U.S. 84, 88 [10 L.Ed.2d 770, 774, 83 S.Ct. 1651], the United States Supreme Court explained: "The tax lien arises, according to § 6322, when the tax is assessed, but as against the specific interests mentioned in § 6323(a)—mortgagees, pledgees, purchasers and judgment creditors—it is not valid until placed of public record, and insofar as the federal lien attaches to securities, mortgagees, pledgees and purchasers must have actual notice of the lien. § 6323(c)."

ation's option to purchase was never recorded, appellant's lien must be given priority as first in time unless the grant of the option to purchase *ipso facto* divested Dickson of his interest in the property, so that, in effect, at the time the Internal Revenue Service lien arose, the taxpayer had no property interest to which it could attach. ■■■ (*Aquilino* v. *United States* (1960) 363 U.S. 509, 512 [4 L.Ed.2d 1365, 1368, 80 S.Ct. 1277]: "The threshold question in . . . all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the lien could attach."

Concerning the property interest of the Association, we note section 6323(a) which directs that a federal tax lien "shall not be valid as against any *purchaser*, . . ." until notice of the lien has been filed. (Italics added.) As defined in subdivision (h)(6)(C) of section 6323, "purchaser" specifically includes one who "for adequate and full consideration" acquires an interest in "an option to purchase or lease property or any interest therein, . . ." a definition which seems clearly to embrace the Association. ■■ But while the term "purchaser" specifically includes one who acquires an "option to purchase," such as that granted to the Association, it is also the rule that a competing property interest cannot take priority over a federal tax lien as first in time unless it has become "choate"—i.e., has acquired sufficient substance to be perfected or valid. (*United States* v. *Vermont* (1964) 377 U.S. 351, 355 [12 L.Ed.2d 370, 373-374, 84 S.Ct. 1267]; *Rice Inv. Co.* v. *United States* (5th Cir. 1980) 625 F.2d 565, 568; *United States* v. *Colby Academy* (E.D.N.Y. 1981) 524 F.Supp. 931, 934.) We must hence determine the precise time at which the Association's option to purchase became a recognizable property interest for purposes of establishing priorities under section 6323. (*U.S.* v. *Pioneer American Ins. Co., supra,* 374 U.S. 84, 87 [10 L.Ed.2d 770, 773-774]; *MDC Leasing* v. *New York Property Ins. Underwriting* (S.D.N.Y. 1978) 450 F.Supp. 179, 181.)

■■ It is settled that the nature and extent of a property interest competing with a federal tax lien for priority will be determined by reference to *state* law. (*Aquilino* v. *United States, supra,* 363 U.S. 509, 512-513 [4 L.Ed.2d 1365, 1368]; *United States* v. *Hunt* (10th Cir. 1975) 513 F.2d 129, 133; *Superior Business Assistance Corp.* v. *United States* (10th Cir. 1972) 461 F.2d 1036, 1038; *United States* v. *Colby Academy, supra,* 524 F.Supp. 931, 934.) The language of subdivision (h)(6) of section 6323 reinforces this rule by providing that a "purchaser" is one who holds a valid property interest "under local law." (See *Mantovani* v. *Fast Fuel Corp.* (S.D.N.Y. 1980) 494 F.Supp. 72, 75.) Once state law has been used to define the property rights held by the competing claimant, federal law will be consulted to ascertain the relative priorities. (*Aquilino* v. *United States, supra,* 363 U.S.

at pp. 513-514 [4 L.Ed.2d at pp. 1368-1369]; *S & S Gasket Co., Inc.* v. *United States* (6th Cir. 1980) 635 F.2d 568, 570; *Bethlehem Steel Corporation* v. *Foley* (2d Cir. 1968) 399 F.2d 314, 316.)

Under California law, the grant of an option to purchase is not the equivalent of a sale of property (*Rollins* v. *Stokes* (1981) 123 Cal.App.3d 701, 709 [176 Cal.Rptr. 835]; *Anthony* v. *Enzler* (1976) 61 Cal.App.3d 872, 876 [132 Cal.Rptr. 553]; *Seeburg* v. *El Royale Corp.* (1942) 54 Cal.App.2d 1, 4 [128 P.2d 362]), and vests no estate in the property. (*Staudigl* v. *Harper* (1946) 76 Cal.App.2d 439, 445 [173 P.2d 343].) Rather, an option is a sale of a *right* to purchase. (*Rollins, supra,* 123 Cal.App.3d 701; *Anthony, supra,* 61 Cal.App.3d 872; *Smith* v. *Morton* (1972) 29 Cal.App.3d 616, 620 [106 Cal.Rptr. 52].) "It is, in other words, a unilateral contract under which the optionee, for consideration he has given, receives from the optionor the right and the power to create a contract of purchase during the life of the option." (*Erich* v. *Granoff* (1980) 109 Cal.App.3d 920, 927 [167 Cal.Rptr. 538].)

But a new contract is not made at the time the option is exercised: "'On the contrary, the contract has already been made as far as the optionor is concerned, but is merely subject to conditions which are removed by acceptance. . . .'" (*Rollins, supra,* 123 Cal.App.3d at p. 709; *Anthony, supra,* 61 Cal.App.3d 872; *Seeburg, supra,* 54 Cal.App.2d 1.) As noted in *Erich* v. *Granoff, supra,* 109 Cal.App.3d at page 928: "An option is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract." And once an option is exercised, the right to acquire the property necessarily relates back to the time the option was granted. (*Rollins* v. *Stokes, supra,* 123 Cal.App.3d 701, 711; *Anthony* v. *Enzler, supra,* 61 Cal.App.3d 872, 876; *Seeburg* v. *El Royale Corp., supra,* 54 Cal.App.2d 1, 4.)

Other options include the following. An unexercised option to purchase contained in a lease constitutes a covenant running with the land. (*Chapman* v. *Great Western Gypsum Co.* (1932) 216 Cal. 420, 424 [14 P.2d 758, 85 A.L.R. 917]; *Maron* v. *Howard* (1968) 258 Cal.App.2d 473, 484 [66 Cal.Rptr. 70].) Subsequent purchasers of property subject to an option who take with notice of its existence take subject to the right of the optionee to complete the purchase. (*Andrade* v. *Casteel* (1947) 81 Cal.App.2d 729, 731 [185 P.2d 51].) An option to purchase is also recognized as a property right for which the owner must be compensated in an eminent domain proceeding. (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 693 [119 Cal.Rptr. 491, 532 P.2d 139]; *Carson Redevelopment*

*Agency* v. *Adam* (1982) 136 Cal.App.3d 608, 613 [186 Cal.Rptr. 615]; *Belmont County Water Dist.* v. *State of California* (1976) 65 Cal.App.3d 13, 22 [135 Cal.Rptr. 163].)

 Thus, when the Association acquired its option to purchase on December 1, 1974, it possessed an indefeasible right to acquire the property and from that moment the taxpayer was helpless to prevent its acquisition by respondent. And when the Association elected to exercise its option to purchase, the contract for sale was merely completed. As earlier observed, its right to the property necessarily related back to the date on which it acquired the option from Dickson, therefore achieving priority over both the assessment and appellant's recorded tax lien.

Relying primarily upon *United States* v. *Security Trust & Sav. Bk.* (1950) 340 U.S. 47 [95 L.Ed. 53, 71 S.Ct. 111], appellant contends that the relation-back doctrine is inapplicable. In that case, however, we note the important distinction that the interest at issue was *inchoate,* whereas here, under the California law made controlling by the terms of the federal statute, the Association's interest was *choate.* (*United States* v. *Security, supra,* at p. 51 [95 L.Ed. at p. 57]; cf. also *Crocker National Bank* v. *Trical Manufacturing Co., supra,* 523 F.2d 1037, 1040.)

 Contrary to appellant's contention the relation-back doctrine is not used here to transform an inchoate lien interest into a choate one, since California law recognizes an option to purchase, once exercised, as a choate right *ab initio* (*Rollins* v. *Stokes, supra,* 123 Cal.App.3d 701, 711)—one which extinguishes intervening rights acquired with notice of its existence. (*Utley* v. *Smith* (1955) 134 Cal.App.2d 448 [285 P.2d 986].)

Appellant further contends that even if the Association's option to purchase is considered a recognizable property right which would "relate back" upon exercise, under federal law the tax lien must prevail because—pursuant to section 6323—a competing claimant must be a "purchaser" *before* notice of the federal tax is filed in order to be given priority. Since the Association neither exercised nor recorded its option to purchase before the tax lien was recorded on July 11, 1975, appellant maintains that respondent was not the "purchaser" of a property interest according to subdivision (h)(6) of section 6323.

We disagree. Subdivision (h)(6) of section 6323 statute does not limit the definition of "purchaser" to one who has recorded or otherwise perfected an interest in property; it gives purchaser status and priority to one who holds a property right "valid under *local law* against subsequent purchasers

without actual notice." (Italics added.) Thus, the language of subdivision (h)(6) preempts judicial definition of choateness. (*Major Electrical Supplies Inc.* v. *J. W. Pettit Co.* (M.D.Fla. 1977) 427 F.Supp. 752, 755.) ▮ While the priority of competing liens is still governed by federal law, local law determines when an interest is valid against subsequent purchasers. (*Ibid.*)

▮ Contrary to appellant's contention, since recordation is not essential to legal recognition of a property interest, but only affects its priority as against subsequent bona fide purchasers, an unrecorded option may be a valid property right. (*Wells Fargo Bank* v. *PAL Investments, Inc.* (1979) 96 Cal.App.3d 431, 438 [157 Cal.Rptr. 818]; *Lawler* v. *Gleason* (1955) 130 Cal.App.2d 390, 395-396 [279 P.2d 70]; *Boye* v. *Boerner* (1940) 38 Cal.App.2d 567, 570 [101 P.2d 757].)[5] We repeat, for example, that an option to purchase, as a covenant running with the land, is valid against a subsequent purchaser who takes with notice of the option. (*Chapman* v. *Great Western Gypsum Co.*, *supra*, 216 Cal. 420, 425; *Andrade* v. *Casteel*, *supra*, 81 Cal.App.2d 729, 731.)

With respect to the problem of notice, it is the rule in California that constructive is the equivalent of actual notice, and that it may be inferred from an optionee's possession of the premises. (*Chapman*, *supra*, 216 Cal. at p. 427; *High Fidelity Enterprises, Inc.* v. *Hull* (1962) 210 Cal.App.2d 279, 281 [26 Cal.Rptr. 654]; *Manig* v. *Bachman* (1954) 127 Cal.App.2d 216, 221 [273 P.2d 596]; *Andrade*, *supra*, 81 Cal.App.2d at p. 731; *Natural Resources, Inc.* v. *Wineberg* (9th Cir. 1965) 349 F.2d 685, 689.) ▮ As explained in *Asisten* v. *Underwood* (1960) 183 Cal.App.2d 304, 309 [7 Cal.Rptr. 84]: "It is a general rule that possession of real property is constructive notice to any intending purchaser or encumbrancer of the property of all the rights and claims of the person in possession which would be disclosed by inquiry."

"The possession required to impart notice to a subsequent purchaser must be open, notorious, exclusive and visible, and not consistent with the record title." (*High Fidelity Enterprises, Inc.* v. *Hull*, *supra*, 210 Cal.App.2d 279, 281.) If either a tenant or a stranger is in possession of leased premises, the purchaser is charged with all those facts which might have been ascertained had a reasonably diligent inquiry been made. (*Manig* v. *Bachman*, *supra*, 127 Cal.App.2d 216, 221-222; *Natural Resources, Inc.* v. *Wineberg*, *supra*,

---

[5]Federal law is the same. A competing claimant can be a "purchaser" as that term is used in 26 United States Code section 6323(a) even though his property interest has not been recorded. (*Haye* v. *United States* (C.D.Cal. 1978) 461 F.Supp. 1168, 1172.) Recording only affects priority against a subsequent bona fide purchaser. (*Ibid.*)

349 F.2d 685, 690.) And as noted in *Pacific Gas & Elec. Co.* v. *Minnette* (1953) 115 Cal.App.2d 698, 705 [252 P.2d 642]: " 'Possession is notice not only of whatever title the occupant has but also of whatever right he may have in the property, and the knowledge chargeable to a person after he is put on inquiry by possession of land is not limited to such knowledge as would be gained by examination of the public records." (Italics omitted.)[6] The subsequent purchaser or encumberer has the burden of showing lack of notice. (*Chalmers* v. *Raras* (1962) 200 Cal.App.2d 682, 686 [19 Cal.Rptr. 531]; *Manig* v. *Bachman, supra,* 127 Cal.App.2d at p. 223.)

Here, after the Association entered into the lease contract and acquired the option to purchase, it made the monthly payments on the property, and, more importantly, employed a resident-manager who occupied Unit No. 203 beginning in December 1974. In our view, appellant was chargeable with knowledge of that possession, and of the contract between James Dickson and the Association, for a subsequent inquiry would plainly have revealed such information. Appellant has accordingly *not* met its burden of establishing lack of notice. We therefore conclude that the option to purchase was valid at the time it was granted on December 1, 1974 (*Utley* v. *Smith, supra,* 134 Cal.App.2d 448, 450) and is entitled to priority over the federal tax lien subsequently assessed and filed. (26 U.S.C. § 6323(a), (h)(6).)

The judgment is affirmed.

Holmdahl, J., and Weinstein, J.,* concurred.

---

[6]Again, section 6323 is consistent; it states, in subdivision (i): "For purposes of this subchapter, an organization shall be deemed for purposes of a particular transaction to have actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such transaction, and in any event from the time such fact would have been brought to such individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routine. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information." (See also *Atlantic Nat. Bank* v. *United States* (Ct.Cl. 1976) 536 F.2d 1354, 1359.)

*Assigned by the Chairperson of the Judicial Council.