Filed 10/23/20; Modified opinion ordered partially published 10/23/20 (mod. order and pub. order attached to opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MES INVESTMENTS, LLC, Plaintiff and Appellant, v. DADSON WASHER SERVICE, INC., Defendant and Respondent. | B297634 Los Angeles County Super. Ct. No. SC127829 ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on September 25, 2020, be modified as follows:

On page 15, heading number "4" is deleted, and the following is inserted in its place:

"**3.    *Dadson Timely Filed Its Motion for Attorney Fees and Memorandum of Costs***"

There is no change in the judgment.

_____

EGERTON, J.                    EDMON, P. J.                    DHANIDINA, J.

Filed 9/25/20  (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MES INVESTMENTS, LLC, | B297634 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. SC127829 |
| v. | |
| DADSON WASHER SERVICE, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Jay R. Stein for Plaintiff and Appellant.

Stark, Friedman & Chapman and Jeannette C.C. Darrow for Defendant and Respondent.

In February 2017, plaintiff and appellant MES Investments, LLC (MES) purchased a 22-unit residential apartment complex in the West Hollywood area of Los Angeles. Some years earlier, in March 2002, the property's prior owner entered into a written lease agreement with defendant Dadson Washer Service, Inc. (Dadson) for the lease of a laundry space in the complex. The lease had an initial term of 10 years and would automatically renew for two additional 10-year terms, unless Dadson elected not to renew it. The lease was already on its second 10-year term when MES purchased the property. MES notified Dadson that it had determined the lease was "no longer operative" because the renewal provision did not comply with Civil Code section 1945.5.[1] Dadson disagreed and refused to vacate the premises. MES filed suit for declaratory relief and cancellation of the lease.

Dadson defeated MES's claims at a bench trial. Because Dadson had leased a non-residential area in the apartment complex for a commercial purpose, the trial court concluded section 1945.5 did not apply to the lease's renewal provision. And, although the lease was not duly recorded, the court ruled MES was nevertheless bound by it, because MES had actual knowledge of the lease when it purchased the property. MES

---

[1]     Civil Code section 1945.5 makes an "automatic renewal" provision of a lease "for the hiring of residential real property" voidable "by the party who did not prepare the lease" unless the renewal provision is printed in "at least eight-point boldface type" and notice of the provision appears "immediately prior to the place where the lessee executes the agreement." Statutory references are to the Civil Code unless otherwise indicated.

appeals these rulings, as well as the court's order awarding Dadson contractual attorney fees and costs. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Dadson is a coin-operated washing machine service company. It provides and services washing machines and dryers in apartment buildings. The company has about 50 employees and about 3,500 active locations with property leases. Dadson enters into leases with the owners of apartment buildings and provides coin-operated laundry equipment for use by the buildings' tenants. The leases typically provide for the building owner to share in the machines' profits above a specified minimum.

On March 11, 2002, Dadson entered into a written lease agreement with 1235 N. Detroit Ave. Associates LLC (Detroit Ave. Associates). The lease provides: "LESSOR grants, conveys and transfers to LESSEE [Dadson] the exclusive use and possession of the laundry room(s) located at the real property commonly known as: [¶] 1235 N. DETROIT AVE., LOS ANGELES [¶] consisting of 22 units ("LEASED PREMISES"), for the purpose of installing, maintaining, and operating coin-operated laundry equipment, to have and to hold the same for and during a term of ten years." The lease states that it "shall be binding upon all future owners of the real property described above" and that it "is the intention of the parties that this lease run with the land described above." Additional terms and conditions are set forth on the backside of the one-page lease agreement, including an automatic renewal

provision for two additional 10-year terms, unless Dadson gives the lessor written notice of its intention not to renew.[2]

The actual street address of the 22-unit apartment complex is 1235 N. Detroit *St.*—not 1235 N. Detroit *Ave.* as stated in the Dadson lease. Thus, when the parties recorded the lease with the Los Angeles County Recorder's Office, it was not duly recorded as part of the property's chain of title.

Before MES completed its purchase of the property, it received a preliminary title report from North American Title Company. The report disclosed an exception from title insurance coverage for "[a]n unrecorded lease dated March 6, 2002, executed by Jeff Lloyd [the Managing Member of Detroit Ave. Associates] as lessor and Dadson Washer Service, Inc. as lessee, as disclosed by a Lease of Laundry Space recorded May 24, 2002 as Instrument No. 2-1208924 of Official Records."

MES's manager, Mark Samuel, reviewed the preliminary title report during escrow. Samuel also reviewed an electronic copy of the Dadson lease through a hyperlink included in the report. He testified that he "felt" the lease did not apply to his property because it stated the leased premises were located at 1235 N. Detroit "Ave."—not "St." Samuel did, however, search for the property address online, and found that when he searched

---

[2] Above the signature lines for the lessor and lessee on the front of the document, the lease states: "All of the terms and conditions set forth in the TERMS AND CONDITIONS on the reverse side of this page and in any addendums are incorporated and made a part hereof. LESSOR REPRESENTS THAT HE OR SHE HAS READ AND UNDERSTANDS AND AGREES TO SUCH TERMS AND CONDITIONS."

for 1235 N. Detroit Ave., the search engine returned pictures of his property at 1235 N. Detroit St.

Samuel also physically inspected the property before closing escrow. He saw washing machines in the complex's laundry room, which also housed tenant mailboxes, a telephone utility box, and a water heater. He claimed not to have noticed a large bright blue and white sign on a wall adjacent to two washing machines with "Dadson" written in very large letters.

On February 28, 2017, MES purchased the property. The day after closing escrow, Samuel sent a letter notifying Dadson that MES was the "new owner of the property located at 1235 N. Detroit St." Samuel wrote that he was "reviewing all of the contracts related to the apartment" and that he would "get back to Dadson Washer in the near future."

On April 18, 2017, Samuel sent a second letter to Dadson notifying the company of MES's determination that "the lease in issue is no longer operative." Samuel wrote: "My review of the lease establishes that it is in violation of Civil Code Section 1945.5 as the renewal terms do not comply. I do not accept the lease as the new owner. At best you have a month to month tenancy." The letter demanded Dadson "remove all of [its] equipment" by June 30, 2017. Dadson did not remove its equipment.

On July 19, 2017, MES filed its complaint against Dadson for declaratory relief, cancellation of the lease, and reasonable rental value. MES alleged Dadson could not enforce the lease as a "covenant running with the land" because the lease was not " 'duly recorded.' " And it asserted the lease's automatic renewal provision was "void or voidable" because it did not comply with section 1945.5.

After a bench trial, the court issued a proposed statement of decision ruling in favor of Dadson on all claims. The court rejected MES's assertion that the failure to duly record the lease rendered it unenforceable against successors in interest. Notwithstanding the deficient recording and the Ave./St. discrepancy, the court found there was "overwhelming" evidence that MES had actual knowledge of the lease before it closed escrow. Thus, the court concluded MES was not a bona fide purchaser and MES did not acquire the property free of Dadson's leasehold interest.

With respect to the automatic renewal provision, the court ruled section 1945.5 did not apply to Dadson's lease. While the statute mandates how automatic renewal provisions must appear in a lease for "the hiring of residential real property" (§ 1945.5), the court found Dadson did not hire "the leased premises for residential purposes." Instead, it had hired the premises for the purpose of " 'installing, maintaining, and operating coin-operated laundry equipment.' "

MES objected to the proposed statement of decision. It argued the bona fide purchaser analysis was insufficient to establish the lease's enforceability against a successor purchaser. MES maintained the lease could not be deemed a covenant running with the land due to the recording deficiency and, therefore, the court was required to determine whether the lease was a personal covenant binding in equity against MES. As for section 1945.5, MES argued the court improperly "differentiate[d] between the residential aspects of the apartment house tenants and the commercial aspects of the laundry lease." It argued this differentiation was contrary to the "real world practicalities" of the property's composition.

6

After receiving Dadson's response to MES's objections, the court entered its final statement of decision without substantive changes. And, after briefing and oral argument, the court awarded Dadson prevailing party costs and contractual attorney fees as provided in the lease.

## DISCUSSION

1.  ***The Dadson Lease Is Enforceable Against MES under Civil Code section 1217***

Because the Dadson lease was not duly recorded, MES contends it cannot be enforced against a successor in interest (like MES) as a covenant running with the land. Thus, MES maintains the lease can only be "equitably" enforced as a "personal covenant," upon a finding that "Dadson came into Court with 'clean hands', did not take advantage of its own wrong, and did not sleep on its own rights." The trial court rejected this argument, concluding the lease could be enforced against MES under the Civil Code, without resorting to equity, because MES had actual knowledge of the lease when it acquired the property. The trial court correctly applied the controlling law.

Section 1214 provides that "[e]very conveyance of real property or an estate for years therein, other than a lease for a term not exceeding one year, *is void* as against any subsequent purchaser or mortgagee of the same property, or any part thereof, in good faith and for a valuable consideration, . . . unless the conveyance shall have been *duly recorded* prior to the record of notice of action." (Italics added.) However, section 1217 provides that "[a]n *unrecorded* instrument *is valid* as between the parties thereto *and those who have notice thereof*." (Italics added.) "[S]ince recordation is *not essential to legal recognition of*

7

*a property interest*, but only affects its priority as against subsequent bona fide purchasers, an unrecorded option may be a valid property right." (*Claremont Terrace Homeowners' Assn. v. United States* (1983) 146 Cal.App.3d 398, 408, italics added; 12 Witkin, Summary of Cal. Law (11th ed. 2020) Real Property, § 345 ["Even when a prior instrument is unrecorded, and there is therefore no constructive notice from the record, a subsequent purchaser may nevertheless have actual knowledge or constructive notice of it and, if so will not be a bona fide purchaser."]; *Gates Rubber Co. v. Ulman* (1989) 214 Cal.App.3d 356, 365.) Here, although the Dadson lease was not duly recorded as part of the Detroit St. property's chain of title, it still constituted a valid property right enforceable against a subsequent purchaser who acquired the property with "notice thereof." (§ 1217.)

MES does not dispute that it had actual notice of the Dadson lease before it purchased the Detroit St. property. It argues, however, that notice is only half of what is required to enforce an unrecorded leasehold interest against a subsequent purchaser, and it maintains the trial court erred when the court declined to determine whether the "equities required" enforcement. (Boldface omitted.) MES bases the argument on the following passage from *Marra v. Aetna Const. Co.* (1940) 15 Cal.2d 375 at page 378 (*Marra*): "Even though a covenant does not run with the land, it may be enforceable in equity against a transferee of the covenantor who takes with knowledge of its terms under circumstances which would make it inequitable to permit him to avoid the restriction." *Marra* is inapposite.

The passage from *Marra* concerns the "doctrine of equitable servitudes," which can be invoked to enforce a covenant in equity that cannot be enforced under the law. (*Marra, supra,* 15 Cal.2d at p. 378.) The issue was whether a covenant in a grant deed prohibiting " 'the grantees, their successors and assigns' " from building any structure on the land "other than a one-family residence" for 40 years could be enforced against subsequent transferees. (*Id.* at p. 376.) The Supreme Court explained that covenants, like the one at issue in *Marra*, "contained in a grant in fee of real property, are governed solely by section 1462 of the Civil Code, which provides: 'Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land.' " (*Id.* at pp. 377–378.) The decisions had consistently "interpreted this provision to mean that a burdensome covenant contained in a deed which in no way benefits the property conveyed *is not binding at law* upon the transferees of the grantee." (*Id.* at p. 378, italics added.) Because the covenant was of "no conceivable benefit" to the property, the high court held it was "not binding upon the respondents under the provisions of the code." (*Ibid.*) However, although the covenant could not be enforced at law, the *Marra* court observed that it might be enforceable under the doctrine of equitable servitudes if the respondents took the property "with knowledge of [the covenant's] terms under circumstances which would make it inequitable to permit [respondents] to avoid the restriction." (*Ibid.*)

Unlike the covenant at issue in *Marra*, Dadson's lease is enforceable against MES under the Civil Code. As discussed, although a lease exceeding a term of one year is normally "void"

9

against a subsequent purchaser unless "duly recorded" prior to the purchase (§ 1214), section 1217 makes the "unrecorded" lease *"valid* as between the parties thereto *and those who have notice thereof."* (§ 1217, italics added.) MES does not dispute the trial court's finding that it had actual notice of the Dadson lease. Thus, the court correctly concluded there was no need to resort to the doctrine of equitable servitudes because enforcement was mandated under the Civil Code. (See § 1217.)

**2.** *Section 1945.5 Does Not Apply to the Dadson Lease*

Section 1945.5 makes an "automatic renewal" provision in a lease "for the hiring of residential real property" "voidable by the party who did not prepare the lease" unless the renewal provision is printed in "at least eight-point boldface type" and notice of the provision, in the same typeface, appears "immediately prior to the place where the lessee executes the agreement." The statute's apparent purpose is to give a residential tenant (who likely did not prepare the lease) the option to avoid a new lease term unless the tenant received clear notice of the automatic renewal provision.[3] It is undisputed that Dadson prepared the lease and that the automatic renewal provision did not meet section 1945.5's typeface and notice requirements.

---

[3] The legislative focus on residential *tenants* is also apparent in the requirement for a notification to appear "immediately prior to the place where the *lessee* executes the agreement." (§ 1945.5, italics added.) Thus, while the statute makes a noncompliant lease "voidable by the party who did not prepare the lease," the statutory text strongly indicates the Legislature believed that party would, more often than not, be the residential tenant— i.e., the "lessee." (*Ibid.*)

10

The trial court determined section 1945.5 did not apply to the Dadson lease because the lease was not "for the hiring of *residential* real property." (§ 1945.5, italics added.) Rather, the court found Dadson had leased "a room used for mechanicals —a telephone box, a water heater, and mailboxes—within a residential apartment complex" for the purpose of " 'installing, maintaining, and operating coin-operated laundry equipment.' "

MES argues the trial court's ruling improperly "differentiate[s] between the residential aspects of the apartment house" and the "commercial aspects of the laundry lease." It maintains the Detroit St. property must be "considered an apartment complex as all aspects of it are provided to facilitate the habitation of the tenants," including the "laundry room area." Because the laundry area is an "essential component" of the apartment complex, MES argues it must be deemed " 'residential real property' " under section 1945.5. We disagree.

The interpretation of statutory language is a judicial function subject to our de novo review. (*Ruiz v. Musclewood Investment Properties, LLC* (2018) 28 Cal.App.5th 15, 20 (*Ruiz*).) We apply established rules of statutory construction to interpret the phrase "hiring of residential real property" in section 1945.5. " ' "Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them their usual and ordinary meaning. [Citation.]" ' [Citation.] 'In doing so, however, we do not consider the statutory language "in isolation." [Citation.] Rather, we look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] . . . We must harmonize "the various parts of a

11

statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole." ' [Citation.] ' "The statute's plain meaning controls the court's interpretation unless its words are ambiguous." ' " (*Ruiz,* at p. 21.)

Section 1945.5 is found in Chapter 2 of Title 5 of the Civil Code, which governs the hiring of real property. Section 1940, the introductory section of Chapter 2, states in relevant part: "[T]his chapter shall apply to all persons who *hire dwelling units* located within this state including tenants, lessees, boarders, lodgers, and others, however denominated." (§ 1940, subd. (a), italics added.) Under subdivision (c), the term " 'Dwelling unit' means a structure or *the part of a structure that is used as a home, residence, or sleeping place* by one person who maintains a household or by two or more persons who maintain a common household." (§ 1940, subd. (c), italics added.)

MES argues we can take no guidance from section 1940, because "the title of Chapter 2 [of the Civil Code] is 'Hiring of Real Property,' not 'Hiring of Dwelling Units.' " We fail to see how that distinction makes any substantive difference. In any event, while neither "residential real property" nor "commercial real property" are defined in Chapter 2, the terms are defined in Title 5 of the Civil Code at sections 1954.51 and 1954.26 in the Chapters governing residential and commercial rent control. The definitions set forth in those two sections evidence the Legislature's plain recognition that both types of property can exist in a single structure.

Consistent with sections 1940 and 1945.5, section 1954.51 defines "Residential real property" to include "any dwelling or unit that is intended for human habitation." (§ 1954.51, subd.

(e).)  In contrast, section 1954.26 defines "Commercial property" to include "any *part, portion, or unit* thereof, and any related facilities, space, or services, except the following [¶] (1) Any dwelling or *dwelling unit* subject to the provisions of *Section 1940.*" (§ 1954.26, subd. (d), italics added.)  Construing section 1945.5, which also appears in Title 5 of the Civil Code, consistent with these definitions and the definition of "dwelling unit" in section 1940, subdivision (c), we conclude a lease for "the hiring of residential real property" means a contract for the temporary possession of a dwelling unit—i.e., the part of a structure that is used as a home, residence, or sleeping place by those who maintain a household in it.

MES acknowledges Title 5's rent control statutes are relevant to our construction of section 1945.5.  It also tacitly concedes the laundry room does not serve as a home, residence, or sleeping place for any of the apartment complex's tenants.  Nevertheless, MES asserts the rent control statutes do "not limit the definition of 'residential real property' to only the inhabited portions of the property."  (Underlining omitted.)  It maintains the critical feature is not habitability, but whether the laundry room is an "integral part of the residential apartment house property."

MES relies upon *People v. Woods* (1998) 65 Cal.App.4th 345, a criminal case that considered whether a " 'commercial laundry facility' within the common area of an apartment complex" constituted "an inhabited dwelling house" under the burglary statute.  (*Id.* at p. 347.)[4]  As the *Woods* court explained,

---

[4]     Under Penal Code section 460, first degree burglary is "[e]very burglary of an inhabited dwelling house; . . . [¶] . . . [a]ll other kinds of burglary are of the second degree."

"[t]he burglary statute defines 'inhabited' as 'currently being used for dwelling purposes, whether occupied or not,' " and "[c]ase law has expanded the definition of 'inhabited dwelling house' to include areas not normally considered part of the 'living space' of a home." (*Id.* at pp. 347–348, citing Pen. Code, § 459; *People v. Moreno* (1984) 158 Cal.App.3d 109; *People v. Zelaya* (1987) 194 Cal.App.3d 73.) Those cases had held that "a basement room or garage, 'under the same roof' with the living quarters, 'functionally' connected therewith, and an 'integral part' thereof, is part of an 'inhabited dwelling house' within the meaning of Penal Code section 460." (*Zelaya,* at p. 75; *Woods,* at p. 348.) But the rationale for this construction was rooted in a purpose unique to the burglary law—to "give effect to the legislative belief that: 'Victims inside buildings are more vulnerable to felonious conduct than victims out of doors.' " (*Zelaya,* at p. 75; see also *Woods,* at p. 350 ["safety and privacy expectations surrounding an inhabited dwelling house are present in the common area laundry room of the apartment complex Woods burgled here"].) That purpose bears no relationship to the concern for tenant protection that apparently induced the Legislature's adoption of section 1945.5. *Woods* and the other burglary cases are inapposite.

The evidence supports the trial court's finding that the laundry room was not residential real property, but rather a machine room, separate and distinct from the dwelling units that the tenants used as their homes, residences, and sleeping places within the apartment complex. The trial court correctly concluded section 1945.5 does not apply to the Dadson laundry room lease.

### 4. *Dadson Timely Filed Its Motion for Attorney Fees and Memorandum of Costs*

Under California Rules of Court, rule 3.1700, a prevailing party "must serve and file a memorandum of costs within 15 days after the *date of service* of the notice of entry of judgment" or "within 180 days after entry of judgment, whichever is first." Under rule 3.1702(b), a prevailing party must file a motion for attorney fees "within the time for filing a notice of appeal"— i.e., within 60 days of being *served* by the superior court clerk or a party with the notice of entry of judgment or a filed-endorsed copy of the judgment, *accompanied by proof of service*, or 180 days after entry of judgment, whichever is first. (See rule 8.104.)

MES claims Dadson's motion for attorney fees and memorandum of costs were untimely because Dadson filed the papers long after it had "*actual notice* of the entry of judgment." (Italics added.) However, the prescribed deadlines are not triggered by actual notice—they require *service* of the notice of entry of judgment. (Cal. Rules of Court, rules 3.1700, 3.1702(b), 8.104(a).)

The record shows the court entered judgment on March 11, 2019. But there is no record of a notice of entry of judgment being filed or served until May 24, 2019—the same date Dadson filed its memorandum of costs. Sixty days later, on July 23, 2019, Dadson filed its motion for contractual attorney fees under the lease.

MES asserts Dadson had "actual notice" of the entry of judgment because the superior court clerk used a self-addressed stamped envelope, which the court had asked Dadson to provide, to mail Dadson a copy of the judgment. The simple act of mailing a conformed copy of the judgment does not trigger the deadlines

15

under the applicable Rules of Court, however, because there has been no *service* of notice of entry of judgment.  The Advisory Committee comments to California Rules of Court, rule 8.104 emphasize the importance of service for establishing these deadlines:  "[A] notice of entry of judgment (or a copy of the judgment) must show the date on which the clerk *served* the document.  The proof of service establishes the date that the 60-day period under subdivision (a)(1)(A) begins to run. [¶] . . . Although the general rule on service (rule 8.25(a)) requires proof of service for all documents served by parties, the requirement is reiterated here because of the serious consequence of a failure to file a timely notice of appeal (see subd. (e))."

It is undisputed that a proof of service did not accompany the judgment mailed to Dadson.  Thus, until Dadson filed and served notice of entry of judgment on May 24, 2019, there was nothing in the record to establish the deadlines for Dadson to file its memorandum of costs or its motion for attorney fees.  (Cf. *Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 64 [for court clerk's service of notice of entry of judgment to establish posttrial motion deadlines, "the clerk's mailed notice must affirmatively state that it was given 'upon order by the court' or 'under section 664.5' and a certificate of mailing the notice must be executed and placed in the file"].)  Based on this record, Dadson's papers were timely.

## DISPOSITION

The judgment and the attorney fees and costs awards are affirmed.  Dadson is entitled to its costs.


EGERTON, J.

We concur:



EDMON, P. J.



DHANIDINA, J.

17

Filed 10/23/20

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MES INVESTMENTS, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DADSON WASHER SERVICE, INC.,<br><br>    Defendant and Respondent. | B297634<br><br>Los Angeles County<br>Super. Ct. No. SC127829<br><br>ORDER CERTIFYING FOR<br>PARTIAL PUBLICATION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

    The opinion in the above-entitled matter, filed on September 25, 2020, was not certified for publication in the Official Reports. For good cause appearing, the opinion is now certified for publication with the exception of parts 1 and 3 of the Discussion. (Rule 8.1110, Cal. Rules of Court.)

    There is no change in the judgment.

_____

EGERTON, J.          EDMON, P. J.          DHANIDINA, J.