[No. H027098. Sixth Dist. Mar. 29, 2005.]

MIGUEL MELENDREZ et al., Plaintiffs and Appellants, v.
D & I INVESTMENT, INC., Defendant and Respondent.

1240

**COUNSEL**

Timan & Walsh, Maryam S. Karson and Richard S. Timan for Plaintiffs and Appellants.

McDonald Law Offices, Edward C. McDonald, Jr.; Law Office of Benjamin R. Levinson, Benjamin R. Levinson; Adleson, Hess & Kelly, Patric J. Kelly, Duane W. Shewaga; Darrow Law Offices and Robert H. Darrow for Defendant and Respondent.

## OPINION

**PREMO, J.**—Miguel and Maria Melendrez (Borrowers) lost their Watson-ville home through a nonjudicial foreclosure sale in July 2001, approximately eight months after their loan default. The residence was purchased by a third party, defendant Royal Realty (Buyer). Borrowers thereafter sued to set aside the trustee's sale and to cancel the trustee's deed. They claimed that the sale was in violation of a repayment agreement (which included a conditional agreement to postpone the sale) with their lender, Washington Mutual Bank, N.A. (Lender), and thus violated Civil Code section 2924g, subdivision (c)(2).[1]

After a three-day bench trial, the court concluded that the trustee's sale was valid. It decided that the sale did not violate the repayment agreement between Borrowers and Lender. It held further that Buyer was a bona fide purchaser for value (BFP) of the property at the sale.

Borrowers appeal. They argue that the trustee's sale was invalid because it took place notwithstanding a repayment agreement under which Lender agreed to postpone the sale. Borrowers contend further that the court erred by applying the wrong legal standard in reaching the conclusion that Buyer was a BFP. They assert that the correct standard required significant consideration of the fact that Buyer was experienced in foreclosure sales.

We review case law suggesting that an experienced foreclosure buyer who acquires property at significantly less than its fair market value cannot be a BFP and reject that conclusion. Accordingly, we hold that the trial court properly determined that Buyer was a BFP. The conclusion flowing directly from the fact that Buyer was a BFP was that the trustee's sale was unassailable as to Buyer in the absence of fraud. Since there was no evidence of fraud chargeable to Buyer, we conclude that the court properly rejected Borrowers' request to void the trustee's sale. We thus affirm the judgment.

### FACTS

#### I. *Borrowers' Loan and Default*

In or about June 1987, Borrowers executed a note and deed of trust in favor of Great Western Savings, Lender's predecessor in interest. The deed of trust granted a security interest in residential property located at 61 White Street, Watsonville, California (Property). Borrowers defaulted on the loan, and Lender initiated foreclosure proceedings in January 2001.[2]

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

[2] All dates are in 2001 unless otherwise indicated.

On January 26, Lender, through the trustee, California Reconveyance Company (Trustee), recorded a notice of default. Borrowers received a copy of the notice. The default notice indicated that Borrowers had defaulted with respect to monthly payments commencing in November 2000, and that the amount due under the loan as of January 24 was $4,266.08.

Lender, through Trustee, recorded a notice of trustee's sale, dated April 27; the notice set the sale date for May 22. Borrowers received a copy of that sale notice as well. The trustee's sale was postponed initially from May 22 to June 4; it was postponed a second time to July 16.[3]

## II. Repayment (Forbearance) Agreement

After receiving the notice of sale in early May, Miguel Melendrez contacted Lender to make payment arrangements concerning the default.[4] Miguel understood from his telephone conversation with Lender's representative, Mary Garcia, that he and his wife, Maria, needed to make three payments, namely, (1) $5,000 before the sale date, (2) a payment at the end of June, and (3) a payment at the end of July. According to Miguel's testimony, Garcia said that, if the $5,000 payment was made before the sale date, Lender would "cancel" the sale.[5] Miguel understood further that, if either of the payments due in June or July were missed, Lender would "start" the sale again.

Thereafter on May 3, Lender faxed a letter (Repayment Agreement, or Agreement) to Borrowers at Maria's store. Miguel was in Greenfield at the time and asked Maria to sign the Repayment Agreement on his behalf and

---

[3] The Trustee's certificate of postponement indicated that the sale was postponed from June 4 to July 16. The complaint, however, noted—consistent with testimony by Lender's representatives and Lender's records—that the sale was postponed from June 4 to July *14*. Since July 14 was a Saturday and it is undisputed—as reflected in the trustee's deed—that the trustee's sale took place on July 16, it appears that the Trustee postponed the sale from June 4 to July *16* because July 14 was a Saturday.

[4] For convenience and clarity, we refer to Mr. and Mrs. Melendrez by their first names. We mean no disrespect in doing so.

[5] The written repayment agreement contradicted Miguel's understanding from the telephone conversation with Garcia that the sale would be "cancelled." It provided that the trustee's sale would not proceed on May 22, if Borrowers made all of the required payments, and that the sale would be postponed from time to time if timely payments were made. In addition, Garcia testified that she merely "took the preliminary information," and that the repayment plan was later "set up" (i.e., written agreement was prepared) by another employee, Robbie Carter. Garcia testified that the repayment plan that she discussed with Miguel involved a postponement of the May 22 trustee's sale as long as Borrowers made the initial payment.

return it by fax to Lender. Maria signed it for herself and on her husband's behalf, and returned it to Lender by fax on May 3.

The typeface of the Repayment Agreement faxed on May 3 was indisputably unclear. Patricia Friedberg (Lender's vice-president) testified that it was faxed to Borrowers not only on May 3, but also on May 22, May 23, and May 29. Miguel testified that he was able to read "part of" the Agreement but did not attempt to obtain a better copy. Maria—who does not read English—did not read the agreement and was not concerned about its legibility.

The Repayment Agreement[6] provided: "This letter when signed by you, dated and returned to Washington Mutual as indicated below, will be your Agreement with Washington Mutual as to the repayment arrangement negotiated on 05-[illegible]-01 [illegible] the outstanding delinquency on the above referenced loan. The following are the terms of the repayment plan which were agreed upon:

| PLAN | DATE | AMT | PLAN | DATE | AMT |
|------|------|-----|------|------|-----|
| 01 | 05/10/01 | 5,000.00 | 02 | 06/29/01 | 3,556.22 |
| 03 | 07/30/01 | 3,556.22." | | | |

The letter stated that all payments were to be made "in CERTIFIED FUNDS ONLY," and that they were required to "be received in our office on or before the due dates indicated, not mailed on those dates. Any grace period afforded by your loan documents is not applicable to the terms of this repayment arrangement."

On the issue of postponement of the trustee's sale, the Agreement provided: "Washington Mutual shall not proceed with the Trustee's Sale on 05/22/01 provided that you make all payments required under the terms of this Agreement and all other payments required under the subject promissory note . . . The Trustee's sale shall initially be postponed to a date following the next payment due under this Agreement. Subsequent postponements will occur after each timely payment is received under the terms of this repayment arrangement. . . . [¶] . . . Should timely payments not be received as described in this arrangement, we reserve the right to immediately proceed with the scheduled Trustee's sale without further notification."

III. *Alleged Modification of Repayment Agreement*

On or about May 18, Borrowers made the $5,000 payment by cashier's check under the Agreement. Several days later, Miguel spoke to Lender's

---

[6] Our quotation of portions of the Agreement is based upon our review of the letter (trial exhibit 7) itself. Illegible words are noted.

foreclosure specialist, Claudio Hernandez, who asked Miguel to fax him a copy of the cashier's check. Miguel testified that during this conversation, he asked whether he could make the second payment (due at the end of June) when he made the third payment at the end of July; Hernandez told him that combining these two payments at the end of July would be acceptable.

Hernandez testified that he had a telephone conversation with Miguel on or about May 21.[7] Hernandez told Miguel that he needed a copy of the cashier's check for the initial payment under the Repayment Agreement in order to postpone the sale. Miguel told Hernandez that he had a copy of the $5,000 cashier's check he had used to make the initial payment, and that he had signed the Agreement.[8] At Hernandez's request, on May 22, Miguel faxed a copy of the cashier's check and a copy of the second page of the Agreement. Hernandez forwarded these documents to Lender's collections department. Based upon receipt of the documents, Hernandez postponed the trustee's sale.[9]

According to Hernandez, Miguel and he did not discuss the June payment due under the Agreement, and Miguel did not ask to defer that payment to the end of July. Hernandez made no notes concerning any such modification request.[10] Since Hernandez was not responsible for repayment agreements, had Miguel made such a request, he would have referred it to the collections department.

After the telephone conversation with Hernandez, Borrowers received a letter from Lender dated May 24. The letter noted that there had been a change in the May 3 Repayment Agreement, namely, that the "plan 01" payment was due May 30. The letter indicated that the "plan 02" and "plan 03" payments were still due on June 29 and July 30, respectively. After Miguel read the May 24 letter, he was not concerned that it contained a

---

[7] Miguel called Hernandez after Maria had previously called Lender on May 21 to determine the status of the loan. In the prior call, Hernandez told Maria that Borrowers were on a repayment plan with a payment of $5,000 due, and he asked Maria to have her husband call him.

[8] The notes entered on the computer by Hernandez concerning this May 21 telephone call with Miguel read: "Rcvd cll frm bwr (husband)[.] He advsd he has a copy of the cck he used to make his $5K rpa pmt. Gave him fax no. and advsd to fax copy to my attn. . CRH." (Capitalization omitted.)

[9] Hernandez made two entries for May 22 into the computer. The first entry read: "Clld bwr and advsd tier2 needs signed stip. Bwr faxed page w/signature on it. Wll fwd to tier2. . . CRH." (Capitalization omitted.) The second entry read: "Rcvd copy of cck # 400728601 iao $5,000.00 paid by borrower to WAMU for their initial rpa pmt. Clld CRC and rqstd to p/pne sale to 7/14/01. *Nxt rpa due 6/29/01*. . . Claudio x8821." (Capitalization omitted, italics added.)

[10] This is borne out by the notes Hernandez recorded contemporaneously with his telephone conversations with Miguel on May 21 and May 22. (See fns. 8 and 9, *ante*.)

different agreement than the one he thought he had with Hernandez. Miguel did not contact Lender to advise that the May 24 letter did not accurately set forth his understanding of the Repayment Agreement. Lender's representative (Friedberg) confirmed that Borrowers never objected to the statement in the May 24 letter that the second payment was due under the Agreement on June 29.

## IV. *Foreclosure*

The trustee's sale took place on July 16. There were approximately four bidders (including Buyer) interested in the Property. Following the auction crier's announcement of Lender's opening bid of approximately $76,000, there were a number of bids by the four prospective buyers. The Property was sold to Buyer as the highest bidder; it paid $197,100.

Buyer's principal, Dominic Ip, is a licensed real estate broker. Ip testified that, in the five years before September 2001, he—either individually or through his real estate business—had bought approximately 15 properties at foreclosure sales. Approximately 50 percent of Buyer's sales resulted from brokerage deals transacted on behalf of others (i.e., *not* Buyer's personal investment transactions).

Prior to the trustee's sale, Ip conducted some research regarding the first lien against the Property, drove by the Property, and ran comparable sales with the Multiple Listing Service to determine the Property's value. Ip did not contact Trustee or Lender prior to the sale.[11] Similarly, Ip did not contact Borrowers, and he had no knowledge of any repayment agreement between Lender and Borrowers.

The trustee's deed (recorded July 26) conveyed the Property to Buyer.[12] The deed noted that a default as indicated in the default notice had occurred and existed at the time of the sale. It also contained a recital that "[a]ll requirements of law regarding the mailing of copies of notices or the publication of a copy of the Notice of Default or the personal delivery of the copy of the Notice of Default and the posting and publication of copies of the Notice of a Sale have been complied with." Borrowers became aware of the

---

[11] Ip, however, did call the number listed on the sale notice from which potential buyers (or, for that matter, the trustors) could determine by voice mail whether the sale was postponed, and, if not, the amount of the opening bid at the sale.

[12] The trustee's deed conveyed the Property to "Royal Realty, a California corporation." Buyer was sued as "Royal Realty," an unknown entity; Buyer, however, filed its answer to the complaint (as well as a cross-complaint) as "D & I Investment, Inc., doing business as Royal Realty." Ip confirmed at trial that D & I Investment, Inc. is a corporation that does business as Royal Realty. Thus, our references throughout this opinion to Buyer are to D & I Investment, Inc., doing business as Royal Realty.

trustee's sale after they saw an eviction notice posted on the front door of their residence in late July.

## V. *Value of Property*

Miguel testified that he believed that the value of the Property was approximately $375,000 as of July 2001. The parties apparently agree—based upon the testimony of their respective expert witnesses—that the fair market value of the Property was between $317,000 and $380,000.

## PROCEDURAL HISTORY

On September 14, Borrowers filed suit seeking, among other things, to set aside the trustee's sale and to cancel the trustee's deed.[13] Borrowers named Lender, Buyer, and Trustee as defendants.

Borrowers filed a first amended complaint (complaint) on February 10, 2003, alleging seven causes of action. Borrowers alleged that the trustee's sale under which Buyer took title to the Property was invalid because it was conducted in violation of an alleged repayment agreement between Borrowers and Lender, as well as in violation of the Lender's own internal procedures. The complaint asserted equitable and legal claims, including claims to cancel the trustee's deed, to quiet title, and for wrongful foreclosure.

Prior to trial, Borrowers, Lender, and Trustee entered into a partial settlement. The settlement included the dismissal of the wrongful foreclosure claim, and a stipulation that Lender and Trustee would remain as nominal defendants as to the equitable claims to cancel the trustee's deed and to quiet title.[14]

The case proceeded to a court trial on October 20, 2003. After a three-day trial, the court concluded that the trustee's sale was valid and found for

---

[13] The record reflects that Buyer filed an action for unlawful detainer against Borrowers, case No. CV141471. Borrowers sought an order consolidating their action with Buyer's unlawful detainer action. The court denied that motion but ordered that trial of Borrowers' action precede trial of the unlawful detainer action.

[14] The settlement stipulation included a recital that on June 11, 2003, the court granted summary adjudication as to three causes of action, namely, claims for cancellation of deed based upon deprivation of due process, breach of fiduciary duty (against Trustee), and breach of implied good faith covenant. (The settlement also included a dismissal of the claim for an accounting.) While the court's summary adjudication order was not made part of the record on appeal, there appears to be no dispute that the trial proceeded between Borrowers and Buyer on only the causes of action for cancellation of trustee's deed, and to quiet title. Lender and Trustee remained defendants as necessary parties; they, however, did not actively participate at the trial.

defendants. On December 23, 2003, the court entered a modified statement of decision and judgment.[15]

Borrowers filed a notice of appeal on February 20, 2004. The appeal from the judgment was filed timely (Cal. Rules of Court, rule 2(a)(1)) and is a proper subject for appellate review.

## DISCUSSION

### I. *Issues on Appeal*

Borrowers challenge the court's entry of judgment against them, asserting the following:

1. The court used an incorrect standard in holding that Buyer was a BFP. (The court's finding directly implicated its rejection of Borrowers' claims.) Using the proper standard, there was no substantial evidence to support the court's conclusion that Buyer was a BFP.

2. The trustee's sale was void because it was held in violation of an agreement between Borrowers and Lender to postpone the sale; the sale going forward notwithstanding this agreement was in violation of section 2924g, subdivision (c)(2).

3. The court abused its discretion in finding that there were no irregularities with respect to the trustee's sale.

4. The court abused its discretion by concluding that the trustee's sale was valid since the sale was "contrary to law."

5. Lender was estopped from enforcing the forbearance agreement.

Because we deem it dispositive of this appeal, we begin by addressing the first contention. In so doing, we (1) summarize the parties' contentions; (2) briefly review the statutory scheme concerning nonjudicial foreclosures; (3) identify the proper standard for determining whether a buyer at a foreclosure sale is a BFP; (4) determine whether there was substantial evidence supporting the court's conclusion here that Buyer was a BFP; (5) discuss the legal implications of Buyer's status as a BFP under the statutory presumptions

---

[15] Buyer filed a cross-complaint against Lender and Trustee, alleging, in essence, a contingent claim for damages, i.e., that if Borrowers prevailed in the action, it would be as a result of the negligence of cross-defendants, and that Buyer would be damaged thereby. The judgment therefore includes a recital that because Borrowers did not prevail on their complaint, the cross-complaint was dismissed as moot.

of section 2924; and (6) decide the legal effect—disregarding section 2924—of Buyer as a BFP acquiring the Property at the trustee's sale.[16]

## II. *Buyer's Status As Bona Fide Purchaser*

### A. *Contentions of the Parties*

The court, in its modified statement of decision, concluded that Buyer "was a bona fide purchaser of the real property for value without notice of any adverse interest or of any irregularity in the sale proceedings." (As we will discuss in pt. II.F., *post*, this determination is of central importance to Borrowers' challenge of the trustee's sale.) Borrowers contend that the court applied an incorrect standard. They claim—citing *Estate of Yates* (1994) 25 Cal.App.4th 511 [32 Cal.Rptr.2d 53] (*Yates*)—that the test to determine whether Buyer was a BFP *should have been* whether Buyer (1) was a speculator who frequently bought property at foreclosure sales, and (2) purchased the Property at the trustee's sale for a price that was substantially less than its fair market value. In the event that both questions are answered in the affirmative (Borrowers argue), the foreclosure buyer *cannot* qualify as a BFP. Applying the *Yates* standard here, Borrowers assert that there was no substantial evidence to support the conclusion that Buyer was a BFP.

Buyer responds that the court applied the proper standard in reaching the conclusion that it was a BFP. Quoting a recent decision of this court, Buyer contends that it was a BFP because "[a] bona fide purchaser is one who pays value for the property without notice of any adverse interest or of any irregularity in the sale proceedings. [Citations.]" (*Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 442 [129 Cal.Rptr.2d 436] (*Nguyen*).)

### B. *Nonjudicial Foreclosure*

"[S]ections 2924 through 2924k provide a comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust." (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830 [30 Cal.Rptr.2d 777] (*Moeller*); see also *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 86–87 [20 Cal.Rptr.3d 1].) This comprehensive statutory scheme has three purposes: " '(1) to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor; (2) to protect the debtor/trustor from wrongful loss of the property; and (3) to ensure that a properly conducted sale is final between the parties and

---

[16] We discuss in part III, *post*, Borrowers' second contention that the foreclosure was invalid because it violated the Repayment Agreement. Finding no merit to this contention, we need not address Borrowers' remaining claims of error.

conclusive as to a bona fide purchaser.' [Citations.]" (*Nguyen, supra*, 105 Cal.App.4th at p. 440.)

██ The manner in which the sale must be conducted is governed by section 2924g, subdivision (a), which requires, inter alia, that the property be sold at public auction to the highest bidder in the county where the property is located. "As a general rule, the purchaser at a nonjudicial foreclosure sale receives title under a trustee's deed free and clear of any right, title or interest of the trustor. [Citation.] A properly conducted nonjudicial foreclosure sale constitutes a final adjudication of the rights of the borrower and lender. [Citation.] Once the trustee's sale is completed, the trustor has no further rights of redemption. [Citation.]" (*Moeller, supra*, 25 Cal.App.4th at p. 831.)

### C. Definition of Bona Fide Purchaser

██ Under section 2924, there is a conclusive presumption[17] created in favor of a BFP who receives a trustee's deed that contains a recital that the trustee has fulfilled its statutory notice requirements. Section 2924 reads in relevant part: "A recital in the deed executed pursuant to the power of sale of compliance with all requirements of law regarding the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery of the copy of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof shall constitute prima facie evidence of compliance with these requirements and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value and without notice."[18]

██ Section 2924 does not contain a definition of "bona fide purchaser" to guide us in evaluating whether the conclusive presumption of the statute is to be applied to a particular foreclosure sale in which the buyer has received a trustee's deed containing the requisite recitals. In the context of applying the presumptions applicable under section 2924, however, we have recently held that a BFP "is one who pays value for the property without notice of any adverse interest or of any irregularity in the sale proceedings. [Citations.]" (*Nguyen, supra*, 105 Cal.App.4th at p. 442.)

---

[17] "A 'conclusive presumption' requires the trier of fact to find the existence of the presumed fact from the existence of the basic fact. An adverse party is not permitted to introduce evidence to contradict or rebut the existence of the presumed fact. [Citation.]" (2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 2004) Presumptions, § 46.6, p. 1055; see also Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 601, p. 38.)

[18] Buyer emphasizes the importance of this conclusive presumption in disposing of this case on appeal. The potential application of this statutory presumption to this case is discussed in part II.E., *post*.

This definition of a BFP in the context of section 2924 is consonant with decisions defining the term under California's recording statutes, including sections 1107[19] and 1214.[20] Thus, "a bona fide purchaser for value who acquires his interest in real property without notice of another's asserted rights in the property takes the property free of such unknown rights. [Citations.]" (*Hochstein v. Romero* (1990) 219 Cal.App.3d 447, 451 [268 Cal.Rptr. 202]; see also *In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 437 [110 Cal.Rptr.2d 615]; *Reiner v. Danial* (1989) 211 Cal.App.3d 682, 689–690 [259 Cal.Rptr. 570].) " 'The elements of bona fide purchase are payment of value, in good faith, and *without actual or constructive notice of another's rights.* [Citation.]' [Citation.]" (*Gates Rubber Co. v. Ulman* (1989) 214 Cal.App.3d 356, 364 [262 Cal.Rptr. 630].) The same elements exist to determine whether a party who takes or purchases a lien is a bona fide encumbrancer. (*Caito v. United California Bank* (1978) 20 Cal.3d 694, 702 [144 Cal.Rptr. 751, 576 P.2d 466]; *First Fidelity Thrift & Loan Assn. v. Alliance Bank* (1998) 60 Cal.App.4th 1433, 1441 [71 Cal.Rptr.2d 295] (*First Fidelity*).)

Thus, the two elements of being a BFP are that the buyer (1) purchase the property in good faith *for value*, and (2) have no knowledge or notice of the asserted rights of another. (14 Powell on Real Property (1996) Recording Acts and Priorities, § 82.01[2], p. 82-12.) The first element does not require that the buyer's consideration be the fair market value of the property (or anything approaching it). (*Id.*, § 82.02[2], pp. 82-77 to 82-79.) Instead, the buyer need only part with something of value in exchange for the property. (See *Horton v. Kyburz* (1959) 53 Cal.2d 59, 65–66 [346 P.2d 399] [rejecting contention that BFP must give "adequate consideration" sufficient to obtain specific performance of a contract].) Thus, while "the 'adequacy' or amount of the consideration given by a subsequent purchaser or encumbrancer may reflect upon his 'good faith,' it does not preclude the consideration from being 'valuable.' The objective of the [recording statutes protecting bona fide purchasers and encumbrancers] is to protect persons who have invested substantial sums of money or property, or who have performed valuable services, in reliance on an honest belief that they are acquiring a good title or lien." (5 Miller & Starr, Cal. Real Estate (3d ed. 2000) Recording and Priorities § 11:52, p. 140, fn. omitted; see also 14 Powell on Real Property

---

[19] "Every grant of an estate in real property is conclusive against the grantor, also against every one subsequently claiming under him, except a purchaser or incumbrancer who in good faith and for a valuable consideration acquires a title or lien by an instrument that is first duly recorded." (§ 1107.)

[20] "Every conveyance of real property or an estate for years therein, other than a lease for a term not exceeding one year, is void as against any subsequent purchaser or mortgagee of the same property, or any part thereof, in good faith and for a valuable consideration, whose conveyance is first duly recorded, and as against any judgment affecting the title, unless the conveyance shall have been duly recorded prior to the record of notice of action." (§ 1214.)

(1999) Transfer by Deed, § 81.A.07[3][d], p. 81A-141 [where BFP "acquires an interest in land and makes an investment in the land, that party is entitled to have his or her expectations protected"].)

■ The second element required to establish BFP status is that the buyer have neither knowledge nor notice of the competing claim. (*Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 530 [81 Cal.Rptr.2d 669] (*Triple A Management*).) The rationale for this requirement is that "[t]he recording laws were not enacted to protect those whose ignorance of the title is deliberate and intentional . . . Their purpose is to protect those who honestly believe they are acquiring a good title, and who invest some substantial sum in reliance on that belief." (*Beach v. Faust* (1935) 2 Cal.2d 290, 292–293 [40 P.2d 822].) "A person generally has 'notice' of a particular fact if that person has knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact. [Citations.]" (*First Fidelity, supra,* 60 Cal.App.4th at p. 1443.)

Borrowers here, however, contend that an entirely different standard applies to determine whether Buyer was a BFP at the foreclosure sale. Citing the Miller and Starr treatise and *Yates, supra,* 25 Cal.App.4th 511, Borrowers claim that a purchaser at a nonjudicial foreclosure sale is *not* bona fide if the purchaser "(1) [is] a speculator who frequently purchases at foreclosure sales, and (2) pays substantially less than the value of the property." We disagree.

In *Yates,* the trustee—knowing that the borrower had died and that the public administrator was administering her estate—failed to give the estate *any notice* of the decedent's default. (*Yates, supra,* 25 Cal.App.4th at p. 516.) While the property had been valued at $120,000 the year before foreclosure (*id.* at p. 515), the buyer of the property—who purchased it from the successful bidder at the trustee's sale—paid $12,000, and took title subject to an existing $20,000 trust deed. (*Id.* at p. 517.) Based upon the complete absence of notice to the administrator and a sale at a grossly inadequate price (i.e., approximately one-quarter of its value), the court set aside the trustee's sale. (*Id.* at pp. 522–523.)

The appellate court in *Yates* affirmed, concluding that "[t]here [was] sufficient evidence in the record to support the probate court's implied conclusion that [the buyer] was not a bona fide purchaser." (*Yates, supra,* 25 Cal.App.4th at p. 523.) This evidence included (1) the fact that the buyer had purchased between 300 and 500 properties in foreclosure over 16 years, (2) the buyer's testimony that " 'there was a lot of juice [equity] in the

property,' " and (3) the fact that there was a "gross inadequacy of the sales price." (*Ibid.*)

Nowhere did the court in *Yates* hold that the *fact* that the buyer is experienced in purchasing foreclosure properties necessarily disqualifies him or her from being a BFP under section 2924. To the contrary, the most that can be said is that the appellate court in *Yates* held that there was sufficient evidence to support the trial court's conclusion that the buyer had notice of the sale's irregularity (i.e., negating the second BFP prong). Its conclusion was based in part upon the buyer's *vast* foreclosure experience (i.e., 300 to 500 foreclosure purchases).[21]

■ Further, we see no reasoned basis for a blanket rule that would preclude a buyer from being a BFP simply because he or she has experience in foreclosure sales and purchases the property at less than fair market value. The law is designed to protect outside buyers[22] who part with value and have no knowledge or notice of a defect. In this respect, the presumption of section 2924 affords protection to the novice and experienced foreclosure buyer alike, and "was clearly designed to provide incentives to the public at large to attend the sales in order to obtain a better price at the sale." (*Homestead Savings v. Darmiento* (1991) 230 Cal.App.3d 424, 434 [281 Cal.Rptr. 367].) A holding that an experienced foreclosure buyer perforce cannot receive the benefits of the law as a BFP if he or she buys property for substantially less than its value would chill participation at trustees' sales by this entire class of buyers, and, ultimately, could have the undesired effect of reducing sales prices at foreclosure.

■ We conclude therefore that the proper standard to determine whether a buyer at a foreclosure sale is a BFP is whether the buyer (1) purchased the property *for value*, and (2) had *no knowledge or notice* of the asserted rights of another.[23] Applying this test, we now review the court's determination here that Buyer was, in fact, a BFP.[24]

---

[21] Likewise, Borrowers' reliance upon the Miller and Starr treatise is unavailing. *Yates* was the only authority cited by the authors of the treatise in support of the view that "a speculator who frequently purchases at foreclosure sales [and] who pays substantially less than the value of the property at a foreclosure sale is not a bona fide purchaser." (4 Miller & Starr, Cal. Real Estate (3d ed. 2003) Deeds of Trust § 10:210, p. 673, fn. omitted.)

[22] A beneficiary who acquires the property at foreclosure sale through a credit bid may not qualify as a BFP. (See *Tomczak v. Ortega* (1966) 240 Cal.App.2d 902, 907 [50 Cal.Rptr. 20]; see also 4 Miller & Starr, Cal. Real Estate, *supra*, Deeds of Trust § 10:211, pp. 680–681.)

[23] Of course, in evaluating whether a buyer at a trustee's sale is a BFP, the buyer's foreclosure sale experience may be considered in making the factual determination of whether he or she had knowledge or notice of the conflicting claim.

[24] Our conclusion here is not inconsistent with our holding in *Nguyen*, where we indicated— citing *Yates*—that "[t]here is authority suggesting that an experienced foreclosure bidder may

### D. *Court's Conclusion That Buyer Was a BFP*

 We note preliminarily that the issue of whether a buyer is a BFP is a question of fact. (*Triple A Management, supra,* 69 Cal.App.4th 520, 536; *Asisten v. Underwood* (1960) 183 Cal.App.2d 304, 311 [7 Cal.Rptr. 84].) Accordingly, we will reverse a trial court's determination on this question only if it is not supported by substantial evidence. (*Triple A Management, supra,* at p. 536; *Hochstein v. Romero, supra,* 219 Cal.App.3d 447, 451.) Moreover, this factual determination is based upon the circumstances that existed at the time of the buyer's acquisition; information learned after the acquisition does not affect the buyer's BFP status. (*Reiner v. Danial, supra,* 211 Cal.App.3d 682, 690 [259 Cal.Rptr. 570].)

As we have concluded, a purchaser at foreclosure is a BFP if he or she (1) purchases the property in good faith and for value, and (2) has no knowledge or notice of the asserted rights claimed by another. The evidence was undisputed that Buyer acquired the Property for value: it paid $197,100 at the auction, after engaging in competitive bidding with three rivals. This purchase price was more than double the initial bid made by Lender. There was no evidence that Buyer acquired the Property in bad faith. The fact that it paid less than the Property's fair market value—giving rise to Borrowers' contention that the consideration was "inadequate"—is of no legal consequence. (See *Horton v. Kyburz, supra,* 53 Cal.2d 59, 65–66.) Indeed, "it is common knowledge that at forced sales such as a trustee's sale the full potential value of the property being sold is rarely realized." (*Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 876 [105 Cal.Rptr. 395]; see also *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1236 [44 Cal.Rptr.2d 352, 900 P.2d 601] [property's price at trustee's sale "is not deemed the equivalent of the property's fair market value"].)

There was also substantial evidence supporting the second BFP requirement (i.e., absence of knowledge or notice of the competing claim). Buyer had no knowledge of the Repayment Agreement; in fact, it had no contact whatsoever with either Lender or Borrowers. Further, at the time of the trustee's sale, Buyer had no notice of Borrowers' asserted rights (i.e., their claim that the Repayment Agreement, as modified, required postponement of the trustee's sale). While we acknowledge that Buyer had significant foreclosure experience, we reject Borrowers' suggestion that this experience compels the conclusion that notice of the Repayment Agreement should be

---

not qualify as a bona fide purchaser." (*Nguyen, supra,* 105 Cal.App.4th at p. 442.) In *Nguyen,* however, we did not reach the question of whether the buyer was a BFP. Because of the absence of any potential grounds for invalidating the foreclosure sale in *Nguyen,* we noted that we did not need to address the issue of whether the sale was governed by a rebuttable or conclusive presumption under section 2924. (*Nguyen, supra,* at p. 444, fn. 7.)

"imputed" to Buyer. There is no authority that would support such a theory of imputed notice under the facts of this case. (See, e.g., *Pierson v. Fischer* (1955) 131 Cal.App.2d 208, 215 [280 P.2d 491] [refusing to set aside trustee's sale based upon claim, inter alia, that sale postponement not properly announced, where BFP was unaware of alleged fraud by trustee]; *Karrell v. First Thrift of Los Angeles* (1951) 104 Cal.App.2d 536, 539 [232 P.2d 1] [rejecting trustor's challenge to trustee's sale, where BFP had no knowledge of any postponement agreement or other transactions between trustor and beneficiary].)

In this instance, therefore—applying the proper BFP test—there was substantial evidence supporting the court's conclusion that Buyer was a BFP. Indeed, there was *little, if any, evidence supporting a contrary conclusion.* We will now address the legal implications of the court's finding that Buyer was a BFP.

### E. *Effect of Buyer's BFP Status Under Section 2924*

 As noted above, section 2924 provides that, where the trustee delivers a deed to the buyer at the foreclosure sale, and the deed recites that all procedural requirements for the default notice and sale notice have been satisfied, there is a statutory rebuttable presumption that such notice requirements have been fulfilled; as to a BFP, this presumption is conclusive. (§ 2924; *Homestead Savings v. Darmiento, supra,* 230 Cal.App.3d 424, 432; *Napue v. Gor-Mey West, Inc.* (1985) 175 Cal.App.3d 608, 620–621 [220 Cal.Rptr. 799].) This statutory presumption was clearly intended to subserve the third goal of the foreclosure statutes that we acknowledged in *Nguyen,* i.e., " 'to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser.' " (*Nguyen, supra,* 105 Cal.App.4th 428, 440; see also *Homestead Savings v. Darmiento, supra,* at pp. 433–434 [recognizing that intent of presumption language "was to promote certainty in favor of the validity of the private foreclosure sale because it encouraged the public at large to bid on the distressed property which in turn benefited the trustor"].)

Here, the trustee's deed indisputably contained the recitals under section 2924 concerning Trustee's compliance with the required procedures for the default and sale notices. Since Buyer was a BFP, Buyer argues that section 2924's conclusive presumption language precludes *any* attack by Borrowers on the trustee's sale. We disagree.

The alleged irregularity in the trustee's sale of which Borrowers complain was that the sale violated the terms of their Repayment Agreement with Lender. As such, Borrowers contend that Trustee violated its statutory obligation of postponing the sale upon agreement of the beneficiary and

trustor, as required under section 2924g, subdivision (c)(2).[25] Borrowers' challenge to the trustee's sale does not involve a claim concerning whether Trustee followed all statutory procedures with respect to the default and sales notices; there is no dispute that Trustee followed the statutory procedures for the default and sales notices. We therefore hold that the conclusive presumption for BFP's under section 2924 does not apply to bar Borrowers' attempt to set aside the trustee's sale.[26]

### F. *Effect of Buyer's BFP Status Generally*

We have concluded that the conclusive presumption under section 2924 did not preclude Borrowers' action to set aside the trustee's sale. We must consider further whether the trial court's conclusion that Buyer was a BFP—supported by substantial evidence—nonetheless rendered the sale invulnerable to Borrowers' challenge. We answer this question in the affirmative.

 We begin with the general proposition that the trustor cannot set aside a foreclosure sale to a BFP "based on irregularities in the foreclosure sale process, except in the case of fraud." (4 Miller & Starr, Cal. Real Estate, *supra*, Deeds of Trust § 10:211, p. 683.) This rule is founded upon BFP principles, generally, that "a bona fide purchaser is not chargeable with the fraud of his predecessors and takes a title purged of any anterior fraud

---

[25] "The trustee shall postpone the sale upon the order of any court of competent jurisdiction, or where stayed by operation of law, or by the mutual agreement, whether oral or in writing, of any trustor and any beneficiary or any mortgagor and any mortgagee." (§ 2924g, subd. (c)(2).)

[26] Section 2924's conclusive presumption language for BFP's applies only to challenges to statutory compliance with respect to default and sales notices. In reaching this conclusion, we recognize that there is dictum that suggests that the conclusive presumption under section 2924 applies across the board to *any* claimed irregularities in the trustee's sale. The court in *Moeller* held that the presumption under section 2924 provides that the trustee's "sale has been conducted regularly and properly," and that, as against a BFP, the presumption operates to prevent the trustor from "attacking the validity of the sale." (*Moeller, supra*, 25 Cal.App.4th 822, 831.) Cases following *Moeller* have similarly described the conclusive presumption— applicable under section 2924 where the buyer is a BFP who has received a trustee's deed—as precluding *any* attack on the trustee's sale. (See *Residential Capital v. Cal-Western Reconveyance Corp.* (2003) 108 Cal.App.4th 807, 817 [134 Cal.Rptr.2d 162] (*Residential Capital*) [once trustee's deed was delivered, "there was a conclusive presumption of validity under section 2924"]; *6 Angels, Inc. v. Stuart-Wright Mortgage, Inc.* (2001) 85 Cal.App.4th 1279, 1286 [102 Cal.Rptr.2d 711] [same]; *Angell v. Superior Court* (1999) 73 Cal.App.4th 691, 699–700 [86 Cal.Rptr.2d 657] [same].) To the extent that Buyer may construe these cases as describing section 2924's presumption as precluding *any* attack on the foreclosure sale as to a BFP—irrespective of whether the challenge relates to the Trustee's compliance with procedural requirements concerning the default and sale notices—we decline to follow such interpretation. (See 4 Miller & Starr, Cal. Real Estate, *supra*, Deeds of Trust § 10:211, p. 680 [section 2924 "presumption only applies to the propriety of the required notices, but it does not apply to other requirements of the foreclosure process"].)

affecting it and free from any equities existing between the original parties. [Citations.]" (*Marlenee v. Brown* (1943) 21 Cal.2d 668, 675 [134 P.2d 770].) The general unassailability of foreclosures promotes twin policies: "[1] that a properly conducted sale be a final adjudication of the rights of the creditor and debtor [citations] and [2 that] the sanctity of title of a bona fide purchaser be protected." (*Moeller, supra*, 25 Cal.App.4th 822, 832.) In this respect, *Strutt v. Ontario Sav. & Loan Assn.* (1970) 11 Cal.App.3d 547 [90 Cal.Rptr. 69] (*Strutt*) is instructive.

In *Strutt*, the trustor challenged the foreclosure sale on the grounds that (1) he had no notice of the sale, and (2) the beneficiary and trustee had both actual and constructive knowledge that he was suffering from a legal disability at the time of the sale: namely, after the court, pursuant to former Penal Code section 1368,[27] suspended separate criminal proceedings pending against the trustor, he was committed to a mental facility by a criminal court after a finding that he was " 'unable to assist counsel in his defense.' " (*Strutt, supra*, 11 Cal.App.3d at p. 552.) The appellate court affirmed the trial court's dismissal of the action after summary judgment in favor of the buyer, Iler, rejecting the trustor's claim that the buyer was charged with constructive notice of trustor's alleged legal disability. (*Id.* at pp. 554–556; see also *Strutt v. Ontario Sav. & Loan Assn., supra*, 28 Cal.App.3d 866, 872 [in subsequent appeal involving trustor, beneficiary, and trustee, court acknowledged its prior holding in *Strutt* that trustee's sale could not be set aside because Iler was BFP].)

In concluding that the trustor's attempt to set aside the sale should be rejected, the court in *Strutt* reasoned: "Viewing the situation most favorably to plaintiff, the most that can be said is that, knowing of his alleged legal disability, [the beneficiary and trustee] may have been guilty of some fraud or imposition upon plaintiff in proceeding with the foreclosure and trustee's sale and that, as between plaintiff and those defendants, the trustee's sale may have been voidable. It would not follow, however, that the subsequent sale to Iler would be invalid, for it is well established that a subsequent good faith purchaser for value and without notice of the fraud or imposition is not chargeable with the fraud or imposition of his predecessor and takes title free of any equity of the person thus defrauded or imposed upon. [Citations.]" (*Strutt, supra*, 11 Cal.App.3d at p. 554; see also *Taliaferro v. Crola* (1957)

---

[27] "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity." (Former Pen. Code, § 1368, as amended by Stats. 1937, ch. 133, § 1, p. 373.)

152 Cal.App.2d 448, 449–450 [313 P.2d 136] [trustor's attack on trustee's sale against buyer receiving trustee's deed must be based upon fraud—not mere irregularity—of which buyer had knowledge or notice].)

In this instance, Borrowers' theory was that the trustee's sale violated the Repayment Agreement; they claim the Agreement was orally modified to permit them to make the June payment at the end of July. Thus, applying the reasoning in *Strutt*, the *most* that can be said is that, in Borrowers' view, there was some potential fraud or imposition because Lender failed to instruct Trustee to postpone the foreclosure sale to a date after the second and third payments were due (i.e., after July 30). There was no evidence that Buyer knew about the Repayment Agreement itself, let alone its alleged modification. Further, there were no facts sufficient to put Buyer on notice of the Agreement or its alleged modification. Buyer was not chargeable with any alleged fraud or imposition, and there was simply no basis for setting aside the trustee's sale. Accordingly, adopting the court's finding that Buyer was a BFP, we must affirm the judgment against Borrowers.

III. *Absence of Prejudicial Procedural Irregularity*

Assuming, arguendo, that Borrowers' challenge of the trustee's sale could survive the legal implications of the court's finding that Buyer was a BFP—which we have found it cannot—we evaluate whether the court's judgment was nonetheless proper. We conclude that it was.

 A nonjudicial foreclosure sale is accompanied by a common law presumption that it "was conducted regularly and fairly." (*Brown v. Busch* (1957) 152 Cal.App.2d 200, 204 [313 P.2d 19]; see also *Stevens v. Plumas Eureka Annex Min. Co.* (1935) 2 Cal.2d 493, 497 [41 P.2d 927].) This presumption may only be rebutted by substantial evidence of prejudicial procedural irregularity. (*6 Angels, Inc. v. Stuart-Wright Mortgage, Inc., supra*, 85 Cal.App.4th 1279, 1284.) The "mere inadequacy of price, absent some procedural irregularity that contributed to the inadequacy of price or otherwise injured the trustor, is insufficient to set aside a nonjudicial foreclosure sale. [Citations.]" (*Ibid.*; see also *Sargent v. Shumaker* (1924) 193 Cal. 122, 129 [223 P. 464] [gross inadequacy in price must be coupled with unfairness or advantage " '*resulting in such gross inadequacy* and consequent injury' " to borrower].) It is the burden of the party challenging the trustee's sale to prove such irregularity and thereby overcome the presumption of the sale's regularity. (*Hatch v. Collins* (1990) 225 Cal.App.3d 1104, 1113 [275 Cal.Rptr. 476].)

Of considerable significance as well is whether a trustee's deed has been prepared and delivered to the buyer. Thus, courts have sustained a number of

foreclosure sale challenges where the actions have been brought *before* the transfer of the trustee's deed to the buyer. (See, e.g., *Residential Capital*, *supra*, 108 Cal.App.4th 807 [trustee refused to issue trustee's deed when it learned that sale had occurred despite postponement agreement between beneficiary and trustor]; *Angell v. Superior Court*, *supra*, 73 Cal.App.4th 691 [after sale but before delivery of trustee's deed, trustee discovered material understatements in default and sale notices concerning amounts due]; *Whitman v. Transtate Title Co.* (1985) 165 Cal.App.3d 312 [211 Cal.Rptr. 582] [trust deed not issued after sale where trustee learned of its failure to grant postponement of sale required by statute]; *Little v. CFS Service Corp.* (1987) 188 Cal.App.3d 1354 [233 Cal.Rptr. 923] (*Little*) [trustee discovered failure to provide statutory sale notices to trustor, junior lienor, and judgment creditor before issuing deed].) These cases—which include ones that Borrowers cite in support of their claims of error—often emphasize that the absence of delivery of a trustee's deed made possible the attack on the trustee's sale.[28] In contrast, Trustee here prepared and delivered a trustee's deed to Buyer.

In this instance, the court concluded that there was no procedural irregularity whatsoever with respect to the trustee's sale. It held that the foreclosure was conducted in accordance with all statutory requirements. The court concluded further that there was no "substantial defect in the foreclosure process apart from the requirements of Civil Code § 2924 et seq., which would justify setting aside the foreclosure sale." Underlying the court's decision was its finding that the Repayment Agreement was *not* orally modified to permit Borrowers to make the June 29 payment on July 30. This finding was supported by substantial evidence.

There was certainly *some* evidence—namely, Miguel's testimony—that Borrowers and Lender orally modified the Repayment Agreement to consolidate the second and third payments on July 30.[29] There was, however, *significant evidence to the contrary*. This evidence included: (1) the written Agreement, itself, signed by the parties, which provided unambiguously that the second payment was due in Lender's office by June 29, and which was never modified in writing to change this due date to July 30; (2) the fact that

---

[28] For instance in *Residential Capital*, the court specifically recognized that "[i]t might be a different case had the trustee's deed been issued" to the buyer. (*Residential Capital*, *supra*, 108 Cal.App.4th at p. 823; see also *Moeller*, *supra*, 25 Cal.App.4th 822, 832 [noting that "trustee may abort a sale to a bona fide purchaser" where foreclosure defect discovered before delivery of trustee's deed]; *Little*, *supra*, 188 Cal.App.3d at p. 1359, fn. 1 [noting that, in "[m]any notice defect cases . . . the trustor was precluded from challenging the sale" because of delivery of the trustee's deed].)

[29] We summarily reject Borrowers' argument that the trustee's sale was improper because it allegedly contravened the parties' agreement that the sale would be "cancelled" if Borrowers made the first payment of $5,000 before the original sale date. This claim was based solely on Miguel's testimony and was directly contradicted by the terms of the Repayment Agreement.

the Agreement was faxed to Borrowers *multiple times* after the alleged oral modification, and Borrowers never contacted Lender to advise that it contained an incorrect due date for the second payment; (3) the fact that Borrowers received Lender's May 24 letter (advising that the second payment was due June 29) and never advised Lender that this term was incorrect; (4) Hernandez's testimony that he had *no* conversation with Miguel about changing the due date of the second payment (or, in fact, concerning the second payment at all); and (5) Lender's records of May 22 (after Hernandez's telephone conversations with Miguel), indicating that the next payment was due on June 29.

Borrowers rely heavily on two cases, each of which concerned disputes between trustor and beneficiary regarding the terms of a repayment agreement. The cases—*Tully v. World Savings & Loan Assn.* (1997) 56 Cal.App.4th 654 [65 Cal.Rptr.2d 545] (*Tully*), and *Sutherland v. Barclays American/Mortgage Corp.* (1997) 53 Cal.App.4th 299 [61 Cal.Rptr.2d 614] (*Sutherland*)—are procedurally and factually distinguishable and offer Borrowers no support.

In *Tully*, the trustor filed an action to set aside a nonjudicial foreclosure sale, claiming, inter alia, that the beneficiary breached a repayment agreement. (*Tully*, *supra*, 56 Cal.App.4th at p. 657.) The beneficiary moved successfully for summary judgment, relying upon an *unsigned* document as establishing the terms of the parties' repayment agreement. (*Id.* at p. 658.) The trustor contradicted the terms of the agreement with a declaration indicating that the beneficiary had agreed to terminate the foreclosure when it accepted the trustor's $20,000 payment. (*Id.* at p. 659.) The appellate court reversed, holding that the trustor's declaration raised a triable issue of fact that precluded summary judgment. (*Id.* at pp. 660–661.)

Significantly, the court in *Tully* did not hold that the trustor was entitled to prevail; it merely held that there was a factual dispute as to the terms of the repayment agreement that could not be resolved by summary judgment. (*Tully*, *supra*, 56 Cal.App.4th at p. 661.) Also of importance, the buyer at the foreclosure sale in *Tully* was *the beneficiary itself*. (*Id.* at p. 658.) Thus, assuming the trier of fact in *Tully* ultimately concluded that the trustee's sale occurred in breach of the parties' repayment agreement, the buyer/beneficiary *could not* claim it was a BFP; it took title at the trustee's sale with full knowledge of the defect (i.e., breach of the repayment agreement).

Likewise, in *Sutherland*, the beneficiary obtained summary judgment in its dispute with the trustor over the terms of a repayment agreement. (*Sutherland*, *supra*, 53 Cal.App.4th 299, 309.) The trustor—whose condominium was severely damaged by the Northridge earthquake in 1994 (*id.* at

pp. 304–305)—obtained from the beneficiary a three-month "stop" to her mortgage payments. (*Id.* at p. 305.) The beneficiary contended that the repayment agreement required the trustor to " 'catch up' " by making three monthly payments at the end of the three-month moratorium. (*Id.* at pp. 307, 310.) The trustor, however, understood that she was not required to make a "catch up" payment, and that the entire term of the loan would be extended by three months. (*Ibid.*) The appellate court reversed, concluding that summary judgment was inappropriate in light of the disputed fact issue as to the terms of the repayment agreement. (*Id.* at pp. 310–313.)

Again, *Sutherland* is distinguishable and offers no aid to Borrowers here. The court there did *not* conclude that the trustor was entitled to prevail; it merely held that summary judgment was improper. (*Sutherland, supra*, 53 Cal.App.4th at p. 311, fn. 7.) Furthermore, *Sutherland* did not involve a foreclosure sale at all. It was an action by the trustor for declaratory and injunctive relief to prevent the beneficiary from asserting a default that trustor claimed was contrary to the parties' agreement. (*Id.* at pp. 308–309.) Therefore, it did not present the issues central to the instant dispute, namely, whether trustors could invalidate a foreclosure sale and cancel a trustee's deed to a buyer who was a BFP, on the basis that the foreclosure allegedly violated the terms of their Repayment Agreement with the beneficiary.

 The trial court here was well within its power to reject Borrowers' contention that the Repayment Agreement was orally modified. Its conclusion was based upon substantial evidence. As a result—even apart from the fact that the trustee's sale was unassailable because Buyer was a BFP—we reject Borrowers' challenge of the court's conclusion that there was no procedural irregularity that overcame the presumption that the foreclosure was regularly and fairly conducted. (See *Crummer v. Whitehead* (1964) 230 Cal.App.2d 264, 268 [40 Cal.Rptr. 826] [acknowledging trial court's discretion to determine "whether the particular facts of a given case justify setting aside a trustee's sale"].)[30]

---

[30] Borrowers also claim that the trustee's sale should be set aside because: (1) Lender did not follow its own internal procedures in dealing with trustors in foreclosure proceedings (e.g., it failed to notify Borrowers of the postponed sale date); and (2) Lender did not properly credit Borrowers' first payment made in May under the Agreement, and this accounting failure resulted in Lender incorrectly noting a default under the Agreement that led to the ultimate foreclosure in July. We reject those contentions as well. As to the first claim, there is no authority for the proposition that a beneficiary's failure to follow its own internal procedures—where such failure is not a breach of its contractual or statutory obligations—is a procedural irregularity that makes a trustee's sale void or voidable. Lender was under no obligation to inform Borrowers of the postponed date(s) of the trustee's sale. Indeed, it is apparent that Borrowers could have easily learned this information by contacting Trustee. (See *Tully, supra,* 56 Cal.App.4th at p. 664 ["debtors bear the responsibility to remain informed about the status of their property that has been put into foreclosure" before their bankruptcy].) We likewise

## DISPOSITION

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 22, 2005.

---

reject the second contention. Given the trial court's factual finding that the Repayment Agreement was not modified, Lender unquestionably had the right to foreclose on July 16, since Borrowers breached the Agreement by failing to make the second payment on or before June 29, 2001.