Filed 4/17/26  Yu v. Delano Retail Center West CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL S. YU et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> DELANO RETAIL CENTER WEST, LLC, <br><br>     Defendant and Respondent. | B336858 <br><br> (Los Angeles County Super. Ct. No. BC562415) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Theresa Traber, Judge.  Affirmed.

Complex Appellate Litigation Group, Jens B. Koepke, Michael von Loewenfeldt; PB Law Group, Luan K. Phan; Law Offices of Egbase and Associates, and Gerald O. Egbase, for Plaintiffs and Appellants.

Garrett & Tully, Ryan C. Squire, Candie Y. Chang, and Scott B. Mahler, for Defendant and Respondent.

———————————

Plaintiffs Michael S. Yu (Yu), My Law Holdings, LLC (My Law), and Michael S. Yu, A Law Corporation (Yu Law) appeal from a judgment entered in favor of defendant Delano Retail Center West, LLC (Delano).  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Facts

### A.     *Yu acquires the subject property and defaults*

In 2007, Yu Law purchased certain real property located in El Monte, California (the property).  Yu Law funded part of the purchase by borrowing $1,196,500 from nonparty Bank of the West (BOW).  The loan was secured by a deed of trust.  Among other things, the deed of trust required Yu Law to pay all taxes levied against the property.  Yu Law later transferred the property to My Law, which also assumed the BOW loan as a co-borrower.  Yu Law also obtained a $984,000 loan from the Small Business Administration (SBA).

Plaintiffs fell behind on payments to BOW.  In May 2010, BOW recorded a Notice of Default (the 2010 NOD) which asserted that Yu Law owed $96,332.65.  The 2010 NOD stated that Yu Law could return its account to good standing by paying all past due payments, costs, and expenses.  Consistent with Civil Code section 2924c, subdivision (b)(1), the 2010 NOD also stated that if Yu Law failed to pay property taxes while in default, BOW could require Yu Law to do so before reinstating its account to good standing.[1]

In August 2010, plaintiffs and BOW entered a forbearance agreement.  The parties entered a second forbearance agreement

---

[1]     Undesignated statutory references are to the Civil Code.

in May 2011. Through both agreements, BOW agreed to delay enforcing its rights against plaintiffs for a set time period in exchange for plaintiffs' commitment to make certain catch-up payments on top of the monthly payments on the loan. Both agreements also required plaintiffs to take specific steps to pay past due property taxes. The trial court later found that plaintiffs made the principal and interest payments required under the 2010 forbearance agreement within the forbearance period, but it also found that plaintiffs failed to comply with the tax obligations.

In May 2012, BOW sold the loan and the deed of trust to Commercial Loan Solutions, LLC (CLS). My Law and CLS discussed a potential payment plan.[2] In August 2012, CLS offered My Law terms for a new forbearance agreement, but My Law did not accept the proposal. On October 26, 2012, My Law told CLS that it would "reinstate the payments as soon as we have the cash flow" and requested "one more month to do the payments." CLS asked My Law what amount it could pay in order to assess whether the parties could "work something out." My Law offered CLS a "partial payment to stop the sale." On November 1, 2012, CLS declined the offer of partial payment and informed My Law that CLS would be selling the property.

### B. Foreclosure sale

CLS assigned the deed of trust to Commercial Loan Solutions III, LLC (CLS III). CLS III foreclosed on the property and set a foreclosure sale for November 1, 2012. CLS III's instructions to the trustee that conducted the sale specified that

---

[2] Plaintiffs communicated directly with Midwest Servicing Incorporated, which CLS had hired to service the loan.

3

any bidder offering more than $880,000, "subject to any and all liens and taxes . . . will be the successful bidder." CLS III further instructed the trustee that if no bidders made an offer, the trustee should make a credit bid of $880,000 on CLS III's behalf. CLS III purchased the property at the foreclosure sale for $880,000.

On November 7, 2012, CLS informed Yu Law that CLS III was the new owner of the property. In November and December 2012, Yu sent numerous letters to CLS III asking it to cancel the "allegedly mistaken foreclosure." Yu also sent at least one similar letter to CLS III's outside counsel. Yu did not pursue any legal remedy as to the property at the time.

In January 2013, Yu agreed to vacate the property. Later that year, Yu passed by the property and observed signs offering it for sale. He did not contact the real estate agency to assert that he was the true owner of the property.

CLS III sued Yu in March 2013 for breach of a guarantee. Yu did not file any cross-claim, did not record a lis pendens against the property, and did not ask the court to stop CLS III from selling the property.

## C.    *Delano acquires the property*

In February 2014, CLS III sold the property to Delano's parent company, Pacific Anchor Holdings, LLC (PAH), for $1,950,000.[3] Justin Huang, the CEO of PAH and the manager of Delano's parent company, negotiated the acquisition on behalf of PAH and Delano.

---

[3]    PAH later assigned its interest in the property to Delano. The parties do not assert that this assignment impacts any issue on appeal.

4

PAH submitted an offer to purchase the property on a California Association of Realtors form Commercial Property Purchase Agreement.  The form agreement would have required CLS III to disclose, among other things, any pending inquiries, actions, or other proceedings affecting the property or the right to use and occupy it.

CLS III counter-offered using a different purchase agreement.  PAH agreed to the terms therein, subject to minor handwritten adjustments.  The agreement specified that the sale was contingent on CLS III's ability to provide a commitment for title insurance from a reputable title insurance company showing that CLS III was the property's owner.  Through the agreement, CLS III represented that it owned the property in fee simple and would transfer it to PAH "free and clear of all liens, except as provided otherwise" in the agreement.  CLS III disclaimed all representations and warranties to the fullest extent permitted by law, except for those expressly stated in the agreement.  CLS III provided PAH with a property information sheet and a mandatory disclosure statement, neither of which disclosed any potential title defects.  In the property information sheet, CLS III represented that it had "no actual knowledge of any encumbrances, covenants, conditions, restrictions, easements, licenses, liens, charges or other matters which affect the title of the Property that are not recorded in the official records of the county recorder where the Property is located . . . ."

Huang, who was a licensed real estate broker, testified that he and a team of about five employees conducted due diligence on the property.  This due diligence included reviewing the documents provided by CLS III and the escrow documents.  Huang relied on CLS III's disclosures, the title report, and CLS

5

III's representation that it would convey title free of all liens. Huang performed no additional investigation into any potential title defects. He did not ever contact CLS III directly to inquire about the property or any potential title issues. Huang testified that he had executed many similar transactions previously, and that this particular transaction was "very straightforward." Delano's expert testified that its due diligence was consistent with industry custom and practice.

PAH acknowledged in the purchase agreement that CLS III had acquired the property "as a result of collateral liquidation," which Huang understood to mean that the property had been foreclosed. PAH also represented, through the agreement, that it had no affiliation with Yu, Yu Law, or My Law. Huang testified that this language was typical in a contract to purchase a foreclosed property, because banks do not want defaulting borrowers to be able to acquire such properties at a discount. Delano's real estate expert also testified that the clause was consistent with industry custom and practice. Huang did not contact CLS III or plaintiffs to inquire about the clause.

Huang inspected the property before the close of escrow. He testified that the property looked as if it had been deserted for a long time. He did not see any signage suggesting Yu or My Law had recently occupied the property. When the transaction closed, Huang was not aware that Yu had sent letters to CLS III asserting that the foreclosure sale was mistaken.

## II. Procedure

In October 2014, plaintiffs filed a lawsuit including several causes of action relating to the property. The operative complaint brought claims against Delano for cancellation of the deed it

6

received from CLS III and for quiet title.[4] The claims against Delano proceeded to a bench trial.

In post-trial briefing, plaintiffs asserted that the foreclosure sale was void because of various irregularities. Specifically, plaintiffs argued that the amount of default identified in the 2010 NOD was inaccurate and that plaintiffs had cured the default by paying the correct amount. Plaintiffs further contended that the sale should be invalidated because CLS III discouraged other bidders and paid an inadequate price for the property. Plaintiffs therefore argued that the deed of trust conveyed at the foreclosure sale was void, and that the deed conveyed to Delano must also be invalidated.

Delano's post-trial briefing argued that it qualified as a bona fide purchaser because it acquired the property without actual or constructive knowledge of plaintiffs' claims. Delano asserted that this was a complete defense to plaintiffs' claims, citing section 2924, subdivision (c), which specifies that when a trust deed recites that the sale complied with the law, a presumption of compliance arises. The presumption is conclusive as to a bona fide purchaser. (§ 2924, subd. (c).) In addition, Delano contended that the deficiencies identified by plaintiffs were not serious enough to void the foreclosure sale.

Plaintiffs asserted that Delano could not qualify as a bona fide purchaser because it failed to adequately inquire about potential title claims.

The trial court's final statement of decision rejected plaintiffs' claims against Delano. It began by assessing the irregularities in the foreclosure process. The court found that the

---

[4] Plaintiffs also brought additional claims against other entities, which are not relevant to any issue in this appeal.

2010 NOD did not accurately state the amount that plaintiffs owed to BOW.  Specifically, the 2010 NOD stated that plaintiffs owed around $96,000 in past due payments as of May 2010.  But BOW records reflected that plaintiffs owed about $70,000 as of July 2010, before plaintiffs began making catch-up payments.  The court also found that plaintiffs made all required payments under the 2010 forbearance agreement and eventually paid BOW enough to cover the past-due principal and interest owed under the 2010 NOD.  However, the court also found that plaintiffs had failed to comply with the tax payment requirements in the 2010 forbearance agreement.  Because plaintiffs did not fully comply with the 2010 forbearance agreement, the court concluded that plaintiffs failed to cure the 2010 NOD.

The court also found that when CLS pursued foreclosure, based on the 2010 NOD, it did not know whether the 2010 NOD was accurate.  In addition, the court found that CLS failed to calculate the amount that plaintiffs owed until two days before the foreclosure sale, and never shared that amount with plaintiffs.  The court nonetheless reasoned that these flaws rendered the foreclosure merely voidable, and not void, because "this is not a case where no NOD was recorded at all or where the kind of default at issue was never included in the NOD."

Next, the court found that the bidding instructions improperly discouraged bidders from participating in the foreclosure sale.  Those instructions specified that the buyer would take the property subject to prior liens, including the $984,000 SBA loan, the balance of which was unknown at the time of trial.  The court also found that CLS III paid less than 60 percent of the property's true value, which the court reasoned was a "significantly undervalued price" but not so " 'grossly

8

inadequate' " as to invalidate the foreclosure sale. Overall, the court concluded that the foreclosure process "was tainted by a pattern of inequitable conduct by the CLS Defendants."

The trial court nonetheless concluded that plaintiffs' claims for quiet title and cancellation of the deed conveyed to Delano must fail because Delano was a bona fide purchaser. The court recognized that the trust deed conveyed to CLS III recited that it complied with statutory notice requirements and other legally required procedures, creating a presumption that the foreclosure sale was conducted regularly and properly. (§ 2924, subd. (c).) The court noted that this presumption is conclusive as to a bona fide purchaser. (*Ibid*.) Next, the court found that Delano was a bona fide purchaser, i.e., a buyer who purchased the property in good faith for value and without actual or constructive notice of any other party's asserted rights. (*RNT Holdings, LLC v. United General Title Ins. Co.* (2014) 230 Cal.App.4th 1289, 1296 (*RNT Holdings*).) The court found that Delano lacked actual knowledge of plaintiffs' letters to CLS III asserting that the foreclosure must have been mistaken. It further found that Delano did not have constructive notice, because Delano was unaware of facts that would lead it to inquire about plaintiffs' potential claims. For example, the court noted that when Delano inspected the property, there was no signage suggesting plaintiffs had recently occupied it. Because it found that Delano was a bona fide purchaser, the court concluded that the presumption of regularity of the foreclosure sale was conclusive as to Delano. (§ 2924, subd. (c).)

Accordingly, the court found against plaintiffs on their claims against Delano and entered judgment in favor of Delano. Plaintiffs timely appealed.

9

## DISCUSSION

On appeal, plaintiffs argue that the trial court erred by concluding that the foreclosure sale was voidable, and not void, and by finding that Delano was a bona fide purchaser. For the reasons discussed herein, we disagree and affirm.

### I. The foreclosure sale was not void

#### a. *Applicable law and standard of review*

In California, real estate financing agreements often use a deed of trust as security. (*Orcilla v. Big Sur, Inc.* (2016) 244 Cal.App.4th 982, 994.) "A deed of trust to real property acting as security for a loan typically has three parties: the trustor (borrower), the beneficiary (lender), and the trustee." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 926 (*Yvanova*).) "[T]he borrower, or 'trustor,' conveys nominal title to property to an intermediary, the 'trustee,' who holds that title as security for repayment of the loan to the lender, or 'beneficiary.' " (*Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 334.) " 'The trustee holds a power of sale. If the debtor defaults on the loan, the beneficiary may demand that the trustee conduct a nonjudicial foreclosure sale.' [Citation.]" (*Yvanova*, at p. 926.)

Nonjudicial foreclosure sales are governed by section 2924 et seq. Among other things, section 2924, subdivision (c) specifies that when a trust deed recites that it has complied with all notice requirements and legally required procedures, "a rebuttable presumption arises that the sale has been conducted regularly and properly . . . ." (*Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813–814 (*Biancalana*).)[5]

---

[5] As the trial court noted, this presumption is "conclusive evidence" of compliance "in favor of bona fide purchasers."

The trial court found, and the parties do not dispute, that the trust deed in this case contained recitations sufficient to trigger this presumption.  Plaintiffs nonetheless assert that the presumption is overcome by irregularities in the default and foreclosure process, and that the foreclosure sale was therefore void.

" 'The word "void," in its strictest sense, means that which has no force and effect, is without legal efficacy, is incapable of being enforced by law, or has no legal or binding force, but frequently the word is used and construed as having the more liberal meaning of "voidable." ' (Black's Law Dict. (5th ed. 1979) p. 1411, col. 2.) 'Voidable' is defined as '[t]hat which may be avoided, or declared void; not absolutely void, or void in itself . . . .' (*Ibid.*)" (*Little v. CFS Service Corp.* (1987) 188 Cal.App.3d 1354, 1358 (*Little*).)

Courts have sometimes muddled this "somewhat elusive distinction." (*Ram v. OneWest Bank, FSB* (2015) 234 Cal.App.4th 1, 12 (*Ram*), citing *Little, supra*, 188 Cal.App.3d at p. 1358 [noting that the terms "*void, voidable,* and *invalid* appear to be used interchangeably"].)  For purposes of this case, the difference is important.  When a contract is void, it is "without legal effect." (*Yvanova, supra*, 62 Cal.4th at p. 929; *Little*, at p. 1358.)  Thus, if the foreclosure sale was void, any subsequent reconveyance of the

_____

(§ 2924, subd. (c).)  Delano asserts that it is a bona fide purchaser, and that the presumption is therefore conclusive under the facts of this case.  Plaintiffs argue that the presumption is conclusive only as to a bona fide purchaser who acquires the property at the foreclosure sale.  We need not resolve this question.  As discussed herein, even assuming that the presumption is not conclusive, the irregularities identified by plaintiffs are insufficient to rebut it.

deed was also void, even as to a bona fide purchaser. (*OC Interior Services, LLC v. Nationstar Mortgage, LLC* (2017) 7 Cal.App.5th 1318, 1332; *Schiavon v. Arnaudo Brothers* (2000) 84 Cal.App.4th 374, 378 (*Schiavon*).) But if the foreclosure sale was merely voidable, a subsequent bona fide purchaser was entitled to rely on it. (*Schiavon*, at p. 378.)

As we have noted, recitations in the deed of trust created a rebuttable presumption that the foreclosure sale was conducted properly. Unless the presumption is overcome, notice defects are " 'deemed voidable, not void.' " (*Ram*, *supra*, 234 Cal.App.4th at pp. 18–19.) "This presumption may only be rebutted by substantial evidence of prejudicial procedural irregularity." (*Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1258 (*Melendrez*).) In assessing this question, courts consider "the nature and severity of the defect, omission or failure and its practical effect on the foreclosure process." (*Ram*, at p. 12.) For example, when a trustee fails to notify the trustor of the foreclosure sale, thus preventing the trustor from challenging it, the sale is void. (*Little*, *supra*, 188 Cal.App.3d at p. 1362.) A foreclosure sale is also void when the entity that purports to convey the property lacks legal authority to sell it. (*Dimock v. Emerald Properties* (2000) 81 Cal.App.4th 868, 874.)

The parties do not challenge the trial court's factual findings relating to the trust deed and the foreclosure sale. Instead, the parties disagree as to whether, under the undisputed facts, the foreclosure sale was void or merely voidable. We review this question of law de novo. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

12

### b. *The irregularities in the foreclosure process were not serious enough to invalidate the sale*

Plaintiffs first argue that the foreclosure sale was void because the 2010 NOD overstated the amount that plaintiffs owed, and because CLS failed to inform plaintiffs of the amount owed after it acquired the loan from BOW. As a threshold matter, we reiterate that the recitations in the deed of trust created a rebuttable presumption of compliance with all notice requirements. To overcome this presumption, plaintiffs must identify "substantial evidence of prejudicial procedural irregularity." (*Melendrez, supra*, 127 Cal.App.4th at p. 1258.) We conclude that plaintiffs did not rebut the presumption.

There is no dispute that plaintiffs had defaulted on the loan at the time of the 2010 NOD. The 2010 NOD served the fundamental purpose of a notice of default—"to afford the debtor an opportunity to cure the default and obtain reinstatement of the obligation . . . ." (*System Inv. Corp. v. Union Bank* (1971) 21 Cal.App.3d 137, 153; compare *Little, supra*, 188 Cal.App.3d at p. 1360 [foreclosure sale void where no notice whatsoever was provided to trustor].) And after receiving the notice, plaintiffs took advantage of this opportunity by entering two forbearance agreements with BOW. Among other things, the agreements required plaintiffs to take steps to pay unpaid property taxes. (§ 2924c [after default, beneficiary may require trustor to pay property taxes in order to reinstate account in good standing].) The trial court found, and plaintiffs do not dispute on appeal, that plaintiffs failed to cure the default because they did not comply with the tax payment requirements. In short, although plaintiffs had notice and several opportunities to cure the default, they failed to do so for reasons unrelated to the amount of

13

principal and interest owed.  Because these notice deficiencies had little or no "practical effect on the foreclosure process," the foreclosure sale was not void.  (*Ram*, *supra*, 234 Cal.App.4th at p. 12; *6 Angels, Inc. v. Stuart-Wright Mortgage, Inc.* (2001) 85 Cal.App.4th 1279, 1284 (*6 Angels*) ["[T]he presumption must prevail when the record lacks substantial evidence of a prejudicial procedural irregularity."].)

Plaintiffs also contend that the foreclosure sale was void because the trial court found that CLS III improperly discouraged other bidders from participating and paid an unfairly low price for the property.  Plaintiffs cite *Biancalana*, in which our Supreme Court recognized that a " ' " 'gross inadequacy of price coupled with even slight unfairness or irregularity is a sufficient basis for setting the sale aside.' " ' "  (*Biancalana*, *supra*, 56 Cal.4th at p. 814.)  But the *Biancalana* court held only that a trustee "was authorized to void the sale" based on irregularities (*id*. at p. 820), meaning the foreclosure sale voidable, not void.  (*Little*, *supra*, 188 Cal.App.3d at p. 1358 [" 'Voidable' is defined as '[t]hat which may be . . . declared void' "].)

Even if *Biancalana* could be understood as holding that the foreclosure sale at issue was void, we would still find it distinguishable, because the rule it described applies only where the purchase price was grossly inadequate.  Here, CLS III purchased the property for $880,000.  The trial court found that this was less than 60 percent of the property's actual value, but it expressly found that this price was not grossly inadequate. Plaintiffs have not identified, and we are unaware of, any case finding gross inadequacy where the purchase price exceeded one-fifth the property's value.  (*Biancalana*, *supra*, 56 Cal.4th at pp.

14

815–816 [bid of 10 percent of intended offer was grossly inadequate]; *Millennium Rock Mortgage, Inc. v. T.D. Service Co.* (2009) 179 Cal.App.4th 804, 810 [one-seventh of potential price grossly inadequate]; *Estate of Yates* (1994) 25 Cal.App.4th 511, 515, 523 [$5,066 purchase price for property valued at $120,000 grossly inadequate]; *Whitman v. Transtate Title Co.* (1985) 165 Cal.App.3d 312, 323 [one-fifth of value grossly inadequate]; *Lopez v. Bell* (1962) 207 Cal.App.2d 394, 397 [same].)  We agree with the trial court that the purchase price in this case was not grossly inadequate.  *Biancalana* therefore does not support plaintiffs' position.

Finally, plaintiffs' reliance on *Bank of America v. La Jolla Group II* (2005) 129 Cal.App.4th 706 is similarly misplaced. There, the trustors' loan went into default, and the beneficiary directed the trustee to record a notice of default and schedule a foreclosure sale.  (*Id.* at p. 709.)  Several days before the sale, the trustors tendered full payment to the beneficiary, and the beneficiary accepted payment and reinstated the loan.  (*Ibid.*) However, the beneficiary failed to communicate this development to the trustee, which sold the property and issued a trustee's deed to the defendants.  (*Ibid.*)  The trial court granted summary judgment for the beneficiary on its claim for cancellation of the sale.  (*Ibid.*)  The appellate court affirmed, concluding that the sale was void because the beneficiary lacked authority to sell the property because it had agreed to permit the trustors to cure the default.  (*Id.* at pp. 712–713.)  In contrast, here, the trial court expressly found that plaintiffs had *not* cured the 2010 NOD because they failed to comply with certain tax payment requirements.  Plaintiffs do not challenge that finding on appeal.

15

*Bank of America* is therefore distinguishable and does not support plaintiffs' position that the foreclosure sale was void.

## II.  Delano was a bona fide purchaser

Because the foreclosure sale was not void, a bona fide purchaser was entitled to rely on it.  (*Schiavon, supra*, 84 Cal.App.4th at p. 378.)  The trial court found that Delano was a bona fide purchaser.  We agree and affirm.

"Generally, to be a bona fide purchaser for value, the buyer must (1) purchase the property in good faith for value, and (2) have no knowledge or notice—actual or constructive—of the asserted rights of another."  (*RNT Holdings, supra*, 230 Cal.App.4th at p. 1296.)  Plaintiffs do not dispute that Delano acquired the property in good faith and for value, and that it lacked actual notice of plaintiffs' claimed interest in the property.  Plaintiffs argue only that Delano had constructive notice of their claim.

"Every person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he or she might have learned that fact."  (§ 19; *First Fidelity Thrift & Loan Assn. v. Alliance Bank* (1998) 60 Cal.App.4th 1433, 1443 (*First Fidelity*) ["A person generally has 'notice' of a particular fact if that person has knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact."].)

Whether a buyer is a bona fide purchaser is a question of fact, and therefore "we will reverse a trial court's determination on this question only if it is not supported by substantial evidence."  (*Melendrez, supra*, 127 Cal.App.4th at p. 1254.)  "Under the substantial evidence standard of review, 'we must

16

consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].' " (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266 (*ASP Properties*).) "To be substantial, the evidence must be of ponderable legal significance, reasonable in nature, credible, and of solid value." (*Ibid.*)

Substantial evidence supports the trial court's finding that Delano was a bona fide purchaser. CLS III represented to Delano that it owned the property and would convey it free and clear of all liens. In the property information sheet, CLS III affirmatively represented that it had no knowledge of any unrecorded encumbrances "or other matters which affect the title of the Property." Huang, Delano's principal, was a licensed real estate broker. He conducted due diligence on Delano's behalf and found no indication in the disclosures or elsewhere of any title defect. Huang visited the property and did not see any signage or other evidence that it had been recently occupied. And Huang testified that he did not learn that plaintiffs had asserted any claim to the property before escrow closed. Finally, Delano's expert testified that its due diligence was consistent with industry standards. This is reasonable, credible, and solid evidence supporting a finding that Delano did not have actual or constructive notice of plaintiffs' title claim. (*ASP Properties*, *supra*, 133 Cal.App.4th at p. 1266.)

Plaintiffs primarily argue that Delano had constructive notice of their asserted rights to the property, which plaintiffs communicated to CLS III by claiming that the foreclosure sale was mistaken. For example, plaintiffs note that the contract required Delano to represent that it was not affiliated with

17

plaintiffs. Plaintiffs assert that this should have led Delano to inquire about the purpose of the clause, and that Delano therefore had constructive knowledge of plaintiffs' claims. However, Huang and Delano's expert testified that this sort of representation was standard for properties that had been foreclosed, because banks prefer not to sell property to defaulting parties. Because this adequately explained the clause, Delano had no obligation to inquire further. (*First Fidelity*, *supra*, 60 Cal.App.4th at p. 1445 [bona fide purchaser's duty to inquire discharged when discrepancy was adequately explained].)

Next, plaintiffs argue that Delano's due diligence was inadequate because it agreed to use CLS III's purchase agreement, which required fewer representations and disclosures than the form agreement that Delano originally proposed. We do not agree. Plaintiffs note that Delano's offer would have required CLS III to disclose any known "inquiry(ies)" or "action(s) . . . affecting the Property, or the right to use and occupy it . . . ." Ultimately, CLS III represented, through the property information statement, that it had "no actual knowledge of any encumbrances, covenants, conditions, restrictions, easements, licenses, liens, charges or other matters which affect the title of the Property that are not recorded . . . ." These representations are functionally equivalent to those in Delano's offer, and more than adequate to assure Delano that CLS III was unaware of any unrecorded matters affecting title to the property.[6] Delano had

---

[6] Notably, plaintiffs do not argue that the representations in the property information statement were inadequate. Plaintiffs' briefing fails to even describe those representations, which arguably forfeits their argument entirely. (Cf. *Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 513 [appellant forfeited substantial

18

no reason to inquire further.  (*First Fidelity*, *supra*, 60 Cal.App.4th at p. 1445 ["only a reasonable inquiry, not an exhaustive one" is required].)

Plaintiffs' legal authority does not aid their position. Plaintiffs cite *Sam v. Kwan* (2024) 101 Cal.App.5th 556 (*Sam*), in which a party bought a parking lot from an LLC.  The preliminary title report in the case "stressed the need . . . to examine the [LLC's] operating agreement and to obtain proof the company was properly operating through its manager." (*Id.* at p. 571.)  The buyer "skipped" that portion of the report and did not investigate the issue.  (*Ibid.*)  As it turned out, one of the LLC's managers asserted that the sale was unauthorized.  The trial court granted summary judgment for the buyer, but the appellate court reversed, concluding that there was a fact dispute as to whether the buyer's investigation was sufficient for it to qualify as a bona fide purchaser.  (*Id.* at pp. 571, 573.)

Unlike in *Sam*, plaintiffs have not identified anything in the preliminary title report, or elsewhere in the record, stressing the need for further investigation.  More significantly, the court in *Sam* was reviewing a grant of summary judgment, meaning it was required to view the evidence in the appellant's favor and to reverse if any material fact was in dispute.  (*Sam*, *supra*, 101 Cal.App.5th at p. 573.)  In contrast, here, the trial court found that Delano was a bona fide purchaser following a bench trial. We review the judgment for substantial evidence, meaning we must view the evidence in Delano's favor and affirm if any substantial evidence supports the judgment.  (*ASP Properties*,

evidence challenge by failing to fairly describe all relevant evidence].)

*supra*, 133 Cal.App.4th at p. 1266.)  As we have discussed, under that standard, we will affirm.

Plaintiffs also cite *Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, in which the trial court reversed a grant of summary judgment in favor of a buyer because certain recorded documents suggested a title defect.  Because the documents were recorded, the reviewing court reasoned that the buyer had constructive notice of the defect.  (*Id.* at p. 722.)  Similarly, in *In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, the buyer's agent was aware that a potential claimant went by two different names, and a recorded instrument under one of the names potentially clouded title.  (*Id.* at p. 432.)  The appellate court concluded that the agent's knowledge, combined with the buyer's constructive knowledge of the recorded instrument, meant that the buyer did not qualify as a bona fide purchaser.  (*Id.* at pp. 437–438.)  In contrast to both cases, plaintiffs have not identified any recorded instrument that suggests a title defect in this case.

Finally, plaintiffs assert that the evidence at trial could support the conclusion that Delano was not a bona fide purchaser.  But when the evidence could support two inferences, a reviewing court may not substitute its own inference for that of the trial court.  (*ASP Properties*, *supra*, 133 Cal.App.4th at p. 1266.)  Thus, even if we agreed that the evidence could support a finding that Delano had constructive notice of plaintiffs' claims for any of the reasons discussed above, we would not reverse the trial court's ruling.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded its appellate costs.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

HANASONO, J.

We concur:

EDMON, P. J.

EGERTON, J.